## MICHIGAN *v.* MOSLEY

No. 74–653.   Argued October 6, 1975—Decided December 9, 1975

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined. WHITE, J., filed an opinion concurring in the result, *post,* p. 107. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post,* p. 111.

*Thomas M. Khalil* argued the cause for petitioner. With him on the brief were *William L. Cahalan, Dominick R. Carnovale,* and *Robert A. Reuther.*

*Carl Ziemba* argued the cause and filed a brief for respondent.*

———

*\*Frank Carrington, Fred E. Inbau, William K. Lambie,* and

MR. JUSTICE STEWART delivered the opinion of the Court.

The respondent, Richard Bert Mosley, was arrested in Detroit, Mich., in the early afternoon of April 8, 1971, in connection with robberies that had recently occurred at the Blue Goose Bar and the White Tower Restaurant on that city's lower east side. The arresting officer, Detective James Cowie of the Armed Robbery Section of the Detroit Police Department, was acting on a tip implicating Mosley and three other men in the robberies.[1] After effecting the arrest, Detective Cowie brought Mosley to the Robbery, Breaking and Entering Bureau of the Police Department, located on the fourth floor of the departmental headquarters building. The officer advised Mosley of his rights under this Court's decision in *Miranda* v. *Arizona,* 384 U. S. 436, and had him read and sign the department's constitutional rights notification certificate. After filling out the necessary arrest papers, Cowie began questioning Mosley about the robbery of the White Tower Restaurant. When Mosley said he did not want to answer any questions about the robberies, Cowie promptly ceased the interrogation. The completion of the arrest papers and the questioning of Mosley together took approximately 20 minutes. At no time during the questioning did Mosley indicate a desire to consult with a lawyer, and there is no claim that the procedures followed to this point did not fully comply with the strictures of the *Miranda* opinion. Mosley was then taken to a ninth-floor cell block.

Shortly after 6 p. m., Detective Hill of the Detroit

---

*Wayne W. Schmidt* filed a brief for Americans for Effective Law Enforcement, Inc., as *amicus curiae* urging reversal.

[1] The officer testified that information supplied by an anonymous caller was the sole basis for his arrest of Mosley.

Police Department Homicide Bureau brought Mosley from the cell block to the fifth-floor office of the Homicide Bureau for questioning about the fatal shooting of a man named Leroy Williams. Williams had been killed on January 9, 1971, during a holdup attempt outside the 101 Ranch Bar in Detroit. Mosley had not been arrested on this charge or interrogated about it by Detective Cowie.[2] Before questioning Mosley about this homicide, Detective Hill carefully advised him of his "*Miranda* rights." Mosley read the notification form both silently and aloud, and Detective Hill then read and explained the warnings to him and had him sign the form. Mosley at first denied any involvement in the Williams murder, but after the officer told him that Anthony Smith had confessed to participating in the slaying and had named him as the "shooter," Mosley made a statement implicating himself in the homicide.[3] The interrogation by Detective Hill lasted approximately 15 minutes, and at no time during its course did Mosley ask to consult with a lawyer or indicate that he did not want to discuss the homicide. In short, there is no claim that the procedures followed during Detective Hill's interrogation of Mosley, standing alone, did not fully comply with the strictures of the *Miranda* opinion.[4]

Mosley was subsequently charged in a one-count information with first-degree murder. Before the trial he moved to suppress his incriminating statement on a number of grounds, among them the claim that under the doctrine of the *Miranda* case it was constitutionally

---

[2] The original tip to Detective Cowie had, however, implicated Mosley in the Williams murder.

[3] During cross-examination by Mosley's counsel at the evidentiary hearing, Detective Hill conceded that Smith in fact had not confessed but had "denied a physical participation in the robbery."

[4] But see n. 5, *infra.*

impermissible for Detective Hill to question him about the Williams murder after he had told Detective Cowie that he did not want to answer any questions about the robberies.[5] The trial court denied the motion to suppress after an evidentiary hearing, and the incriminating statement was subsequently introduced in evidence against Mosley at his trial. The jury convicted Mosley of first-degree murder, and the court imposed a mandatory sentence of life imprisonment.

On appeal to the Michigan Court of Appeals, Mosley renewed his previous objections to the use of his incriminating statement in evidence. The appellate court reversed the judgment of conviction, holding that Detective Hill's interrogation of Mosley had been a *per se* violation of the *Miranda* doctrine. Accordingly, without reaching Mosley's other contentions, the Court remanded the case for a new trial with instructions that Mosley's statement be suppressed as evidence. 51 Mich. App. 105, 214 N. W. 2d 564. After further appeal was denied by the Michigan Supreme Court, 392 Mich. 764, the State filed a petition for certiorari here. We granted the writ because of the important constitutional question presented. 419 U. S. 1119.

In the *Miranda* case this Court promulgated a set of safeguards to protect the there-delineated constitutional rights of persons subjected to custodial police interrogation. In sum, the Court held in that case that unless law enforcement officers give certain specified warnings be-

---

[5] In addition to the claim that Detective Hill's questioning violated *Miranda,* Mosley contended that the statement was the product of an illegal arrest, that the statement was inadmissible because he had not been taken before a judicial officer without unnecessary delay, and that it had been obtained through trickery and promises of leniency. He argued that these circumstances, either independently or in combination, required the suppression of his incriminating statement.

fore questioning a person in custody,[6] and follow certain specified procedures during the course of any subsequent interrogation, any statement made by the person in custody cannot over his objection be admitted in evidence against him as a defendant at trial, even though the statement may in fact be wholly voluntary. See *Michigan* v. *Tucker*, 417 U. S. 433, 443.

Neither party in the present case challenges the continuing validity of the *Miranda* decision, or of any of the so-called guidelines it established to protect what the Court there said was a person's constitutional privilege against compulsory self-incrimination. The issue in this case, rather, is whether the conduct of the Detroit police that led to Mosley's incriminating statement did in fact violate the *Miranda* "guidelines," so as to render the statement inadmissible in evidence against Mosley at his trial. Resolution of the question turns almost entirely on the interpretation of a single passage in the *Miranda* opinion, upon which the Michigan appellate court relied in finding a *per se* violation of *Miranda*:

> "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody

---

[6] The warnings must inform the person in custody "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U. S., at 444.

interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." 384 U. S., at 473–474.[7]

This passage states that "the interrogation must cease" when the person in custody indicates that "he wishes to remain silent." It does not state under what circumstances, if any, a resumption of questioning is permissible.[8] The passage could be literally read to mean that

---

[7] The present case does not involve the procedures to be followed if the person in custody asks to consult with a lawyer, since Mosley made no such request at any time. Those procedures are detailed in the *Miranda* opinion as follows:

"If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

"This does not mean, as some have suggested, that each police station must have a 'station house lawyer' present at all times to advise prisoners. It does mean, however, that if police propose to interrogate a person they must make known to him that he is entitled to a lawyer and that if he cannot afford one, a lawyer will be provided for him prior to any interrogation. If authorities conclude that they will not provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from doing so without violating the person's Fifth Amendment privilege so long as they do not question him during that time." *Id.*, at 474.

[8] The Court did state in a footnote:

"If an individual indicates his desire to remain silent, but has an attorney present, there may be some circumstances in which further questioning would be permissible. In the absence of evidence of overbearing, statements then made in the presence of counsel might be free of the compelling influence of the interrogation process and

a person who has invoked his "right to silence" can never again be subjected to custodial interrogation by any police officer at any time or place on any subject. Another possible construction of the passage would characterize "any statement taken after the person invokes his privilege" as "the product of compulsion" and would therefore mandate its exclusion from evidence, even if it were volunteered by the person in custody without any further interrogation whatever. Or the passage could be interpreted to require only the immediate cessation of questioning, and to permit a resumption of interrogation after a momentary respite.

It is evident that any of these possible literal interpretations would lead to absurd and unintended results. To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. Clearly, therefore, neither this passage nor any other passage in the *Miranda* opinion can sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any

---

might fairly be construed as a waiver of the privilege for purposes of these statements." *Id.*, at 474 n. 44.

This footnote in the *Miranda* opinion is not relevant to the present case, since Mosley did not have an attorney present at the time he declined to answer Detective Cowie's questions, and the officer did not continue to question Mosley but instead ceased the interrogation in compliance with *Miranda*'s dictates.

police officer on any subject, once the person in custody has indicated a desire to remain silent.[9]

A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt "fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored . . . ." 384 U. S., at 479. The critical safeguard identified in the passage at issue is a person's "right to cut off questioning." *Id.,* at 474. Through the exercise of his option to terminate questioning he can control the time at

---

[9] It is instructive to note that the vast majority of federal and state courts presented with the issue have concluded that the *Miranda* opinion does not create a *per se* proscription of any further interrogation once the person being questioned has indicated a desire to remain silent. See *Hill* v. *Whealon,* 490 F. 2d 629, 630, 635 (CA6 1974); *United States* v. *Collins,* 462 F. 2d 792, 802 (CA2 1972) (en banc); *Jennings* v. *United States,* 391 F. 2d 512, 515–516 (CA5 1968); *United States* v. *Choice,* 392 F. Supp. 460, 466–467 (ED Pa. 1975); *McIntyre* v. *New York,* 329 F. Supp. 9, 13–14 (EDNY 1971); *People* v. *Naranjo,* 181 Colo. 273, 277–278, 509 P. 2d 1235, 1237 (1973); *People* v. *Pittman,* 55 Ill. 2d 39, 54–56, 302 N. E. 2d 7, 16–17 (1973); *State* v. *McClelland,* 164 N. W. 2d 189, 192–196 (Iowa 1969); *State* v. *Law,* 214 Kan. 643, 647–649, 522 P. 2d 320, 324–325 (1974); *Conway* v. *State,* 7 Md. App. 400, 405–411, 256 A. 2d 178, 181–184 (1969); *State* v. *O'Neill,* 299 Minn. 60, 70–71, 216 N. W. 2d 822, 829 (1974); *State* v. *Godfrey,* 182 Neb. 451, 454–457, 155 N. W. 2d 438, 440–442 (1968); *People* v. *Gary,* 31 N. Y. 2d 68, 69–70, 286 N. E. 2d 263, 264 (1972); *State* v. *Bishop,* 272 N. C. 283, 296–297, 158 S. E. 2d 511, 520 (1968); *Commonwealth* v. *Grandison,* 449 Pa. 231, 233–234, 296 A. 2d 730, 731 (1972); *State* v. *Robinson,* 87 S. D. 375, 378, 209 N. W. 2d 374, 375–377 (1973); *Hill* v. *State,* 429 S. W. 2d 481, 486–487 (Tex. Crim. App. 1968); *State* v. *Estrada,* 63 Wis. 2d 476, 486–488, 217 N. W. 2d 359, 365–366 (1974). See also *People* v. *Fioritto,* 68 Cal. 2d 714, 717–720, 441 P. 2d 625, 626–628 (1968) (permitting the suspect but not the police to initiate further questioning).

Citation of the above cases does not imply a view of the merits of any particular decision.

which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his "right to cut off questioning" was "scrupulously honored." [10]

A review of the circumstances leading to Mosley's confession reveals that his "right to cut off questioning" was fully respected in this case. Before his initial interrogation, Mosley was carefully advised that he was under no obligation to answer any questions and could remain silent if he wished. He orally acknowledged that he understood the *Miranda* warnings and then signed a printed notification-of-rights form. When Mosley stated that he did not want to discuss the robberies, Detective Cowie immediately ceased the interrogation and did not try either to resume the questioning or in any way to persuade Mosley to reconsider his position. After an interval of more than two hours, Mosley was questioned by another police officer at another location about an unrelated holdup murder. He was given full and complete *Miranda* warnings at the outset of the second interrogation. He was thus reminded again that he could remain silent and could consult with a lawyer,

---

[10] The dissenting opinion asserts that *Miranda* established a requirement that once a person has indicated a desire to remain silent, questioning may be resumed only when counsel is present. *Post*, at 116–117. But clearly the Court in *Miranda* imposed no such requirement, for it distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and directed that "the interrogation must cease until an attorney is present" only "[i]f the individual states that he wants an attorney." 384 U. S., at 474.

and was carefully given a full and fair opportunity to exercise these options. The subsequent questioning did not undercut Mosley's previous decision not to answer Detective Cowie's inquiries. Detective Hill did not resume the interrogation about the White Tower Restaurant robbery or inquire about the Blue Goose Bar robbery, but instead focused exclusively on the Leroy Williams homicide, a crime different in nature and in time and place of occurrence from the robberies for which Mosley had been arrested and interrogated by Detective Cowie. Although it is not clear from the record how much Detective Hill knew about the earlier interrogation, his questioning of Mosley about an unrelated homicide was quite consistent with a reasonable interpretation of Mosley's earlier refusal to answer any questions about the robberies.[11]

This is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to

---

[11] Detective Cowie gave the only testimony at the suppression hearing concerning the scope of Mosley's earlier refusal to answer his questions:

"A. I think at that time he declined to answer whether he had been involved.

"Q. He declined to answer?

"A. Yes. Anything about the robberies."

At the suppression hearing, Mosley did not in any way dispute Cowie's testimony. Not until trial, after the judge had denied the motion to suppress the incriminating statement, did Mosley offer a somewhat different version of his earlier refusal to answer Detective Cowie's questions. The briefs submitted by Mosley's counsel to the Michigan Court of Appeals and to this Court accepted Detective Cowie's account of the interrogation as correct, and the Michigan Court of Appeals decided the case on that factual premise. At oral argument before this Court, both counsel discussed the case solely in terms of Cowie's description of the events.

wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.

The Michigan Court of Appeals viewed this case as factually similar to *Westover* v. *United States,* 384 U. S. 436, a companion case to *Miranda.* But the controlling facts of the two cases are strikingly different.

In *Westover,* the petitioner was arrested by the Kansas City police at 9:45 p. m. and taken to the police station. Without giving any advisory warnings of any kind to Westover, the police questioned him that night and throughout the next morning about various local robberies. At noon, three FBI agents took over, gave advisory warnings to Westover, and proceeded to question him about two California bank robberies. After two hours of questioning, the petitioner confessed to the California crimes. The Court held that the confession obtained by the FBI was inadmissible because the interrogation leading to the petitioner's statement followed on the heels of prolonged questioning that was commenced and continued by the Kansas City police without preliminary warnings to Westover of any kind. The Court found that "the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation" and that the belated warnings given by the federal officers were "not sufficient to protect" Westover because from his point of view "the warnings came at the end of the interrogation process." *Id.,* at 497, 496.

Here, by contrast, the police gave full *"Miranda* warnings" to Mosley at the very outset of each interrogation, subjected him to only a brief period of initial question-

ing, and suspended questioning entirely for a significant period before beginning the interrogation that led to his incriminating statement. The cardinal fact of *West-over*—the failure of the police officers to give any warnings whatever to the person in their custody before embarking on an intense and prolonged interrogation of him—was simply not present in this case. The Michigan Court of Appeals was mistaken, therefore, in believing that Detective Hill's questioning of Mosley was "not permitted" by the *Westover* decision. 51 Mich. App., at 108, 214 N. W. 2d, at 566.

For these reasons, we conclude that the admission in evidence of Mosley's incriminating statement did not violate the principles of *Miranda* v. *Arizona.* Accordingly, the judgment of the Michigan Court of Appeals is vacated, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

Mr. Justice White, concurring in the result.

I concur in the result and in much of the majority's reasoning. However, it appears to me that, in an effort to make only a limited holding in this case, the majority has implied that some custodial confessions will be suppressed even though they follow an informed and voluntary waiver of the defendant's rights. The majority seems to say that a statement obtained within some unspecified time after an assertion by an individual of his "right to silence" is always inadmissible, even if it was the result of an informed and voluntary decision—following, for example, a disclosure to such an individual of a piece of information bearing on his waiver decision which the police had failed to give him prior to his assertion of the privilege but which they gave him immediately thereafter. Indeed, *ante,* at 102, the majority char-

acterizes as "absurd" any contrary rule. I disagree. I do not think the majority's conclusion is compelled by *Miranda* v. *Arizona,* 384 U. S. 436 (1966), and I suspect that in the final analysis the majority will adopt voluntariness as the standard by which to judge the waiver of the right to silence by a properly informed defendant. I think the Court should say so now.

*Miranda* holds that custody creates an inherent compulsion on an individual to incriminate himself in response to questions, and that statements obtained under such circumstances are therefore obtained in violation of the Fifth Amendment privilege against compelled testimonial self-incrimination unless the privilege is "knowingly and intelligently waived." *Id.,* at 471, 475. It also holds that an individual will not be deemed to have made a knowing and intelligent waiver of his "right to silence" unless the authorities have first informed him, *inter alia,* of that right—"the threshold requirement for an intelligent decision as to its exercise." *Id.,* at 468. I am no more convinced that *Miranda* was required by the United States Constitution than I was when it was decided. However, there is at least some support in the law both before and after *Miranda* for the proposition that some rights will never be deemed waived unless the defendant is first expressly advised of their existence. *E. g., Carnley* v. *Cochran,* 369 U. S. 506 (1962); *Boykin* v. *Alabama,* 395 U. S. 238 (1969); Fed. Rules Crim. Proc. 11, 32 (a)(2). There is little support in the law or in common sense for the proposition that an *informed* waiver of a right may be ineffective even where voluntarily made. Indeed, the law is exactly to the contrary, *e. g., Tollett* v. *Henderson,* 411 U. S. 258 (1973); *Brady* v. *United States,* 397 U. S. 742 (1970); *McMann* v. *Richardson,* 397 U. S. 759 (1970); *Parker* v. *North Carolina,* 397 U. S. 790 (1970). Unless an individual is

incompetent, we have in the past rejected any paternalistic rule protecting a defendant from his intelligent and voluntary decisions about his own criminal case. *Faretta* v. *California,* 422 U. S. 806 (1975). To do so would be to "imprison a man in his privileges,"[1] *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 280 (1942), and to disregard " 'that respect for the individual which is the lifeblood of the law,' " *Faretta* v. *California, supra,* at 834. I am very reluctant to conclude that *Miranda* stands for such a proposition.

The language of *Miranda* no more compels such a result than does its basic rationale. As the majority points out, the statement in *Miranda,* 384 U. S., at 474, requiring interrogation to *cease* after an assertion of the "right to silence" tells us nothing because it does not indicate how soon this interrogation may resume. The Court showed in the very next paragraph, moreover, that when it wanted to create a *per se* rule against further interrogation after assertion of a right, it knew how to do so. The Court there said "[i]f the individual states that he

---

[1] The majority's rule may cause an accused injury. Although a recently arrested individual may have indicated an initial desire not to answer questions, he would nonetheless want to know immediately—if it were true—that his ability to explain a particular incriminating fact or to supply an alibi for a particular time period would result in his immediate release. Similarly, he might wish to know—if it were true—that (1) the case against him was unusually strong and that (2) his immediate cooperation with the authorities in the apprehension and conviction of others or in the recovery of property would redound to his benefit in the form of a reduced charge. Certainly the individual's lawyer, if he had one, would be interested in such information, even if communication of such information followed closely on an assertion of the "right to silence." Where the individual has not requested counsel and has chosen instead to make his own decisions regarding his conversations with the authorities, he should not be deprived even temporarily of any information relevant to the decision.

wants an attorney, the interrogation must cease *until an attorney is present.*" *Ibid.*[2] However, when the individual indicates that *he* will decide unaided by counsel whether or not to assert his "right to silence" the situation is different. In such a situation, the Court in *Miranda* simply said: "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.*, at 475. Apparently, although placing a heavy burden on the government, *Miranda* intended waiver of the "right to silence" to be tested by the normal standards. In any event, insofar as the *Miranda* decision might be read to require interrogation to cease for some magical and unspecified period of time following an assertion of the "right to silence," and to reject voluntariness as the standard by which to judge informed waivers of that right, it should be disapproved as inconsistent with otherwise uniformly applied legal principles.

In justifying the implication that questioning must inevitably cease for some unspecified period of time following an exercise of the "right to silence," the ma-

---

[2] The question of the proper procedure following expression by an individual of his desire to consult counsel is not presented in this case. It is sufficient to note that the reasons to keep the lines of communication between the authorities and the accused open when the accused has chosen to make his own decisions are not present when he indicates instead that he wishes legal advice with respect thereto. The authorities may then communicate with him through an attorney. More to the point, the accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism.

jority says only that such a requirement would be necessary to avoid "undermining" "the will of the person being questioned." Yet surely a waiver of the "right to silence" obtained by "undermining the will" of the person being questioned would be considered an involuntary waiver. Thus, in order to achieve the majority's only stated purpose, it is sufficient to exclude all confessions which are the result of involuntary waivers. To exclude any others is to deprive the factfinding process of highly probative information for no reason at all. The "repeated rounds" of questioning following an assertion of the privilege, which the majority is worried about, would, of course, count heavily against the State in any determination of voluntariness—particularly if no reason (such as new facts communicated to the accused or a new incident being inquired about) appeared for repeated questioning. There is no reason, however, to rob the accused of the choice to answer questions voluntarily for some unspecified period of time following his own previous contrary decision. The Court should now so state.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, dissenting.

The Court focuses on the correct passage from *Miranda* v. *Arizona,* 384 U. S. 436, 473–474 (1966) (footnote omitted):

> "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to

cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked."

But the process of eroding *Miranda* rights, begun with *Harris* v. *New York*, 401 U. S. 222 (1971), continues with today's holding that police may renew the questioning of a suspect who has once exercised his right to remain silent, provided the suspect's right to cut off questioning has been "scrupulously honored." Today's distortion of *Miranda*'s constitutional principles can be viewed only as yet another step in the erosion and, I suppose, ultimate overruling of *Miranda*'s enforcement of the privilege against self-incrimination.

The *Miranda* guidelines were necessitated by the inherently coercive nature of in-custody questioning. As in *Escobedo* v. *Illinois*, 378 U. S. 478 (1964), "we sought a protective device to dispel the compelling atmosphere of the interrogation." 384 U. S., at 465. We "concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.*, at 467.[1] To assure safeguards that promised to dispel the "inherently compelling pressures" of in-custody interrogation, a prophylactic rule was fashioned to supplement the traditional determination of voluntariness on the facts of each case. *Miranda* held that any confession obtained when not preceded by the required warn-

---

[1] The Court said further:

"Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." 384 U. S., at 458.

ings or an adequate substitute safeguard was *per se* inadmissible in evidence. *Id.*, at 468–469, 479. Satisfaction of this prophylactic rule, therefore, was necessary, though not sufficient, for the admission of a confession. Certiorari was expressly granted in *Miranda* "to give concrete constitutional guidelines for law enforcement agencies and courts to follow," *id.*, at 441–442, that is, clear, objective standards that might be applied to avoid the vagaries of the traditional voluntariness test.

The task that confronts the Court in this case is to satisfy the *Miranda* approach by establishing "concrete constitutional guidelines" governing the resumption of questioning a suspect who, while in custody, has once clearly and unequivocally "indicate[d] . . . that he wishes to remain silent . . . ." As the Court today continues to recognize, under *Miranda,* the cost of assuring voluntariness by procedural tests, independent of any actual inquiry into voluntariness, is that some voluntary statements will be excluded. *Ante,* at 99–100. Thus the consideration in the task confronting the Court is not whether voluntary statements will be excluded, but whether the procedures approved will be sufficient to assure with reasonable certainty that a confession is not obtained under the influence of the compulsion inherent, in interrogation and detention. The procedures approved by the Court today fail to provide that assurance.

We observed in *Miranda:* "Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion

of a voluntary relinquishment of the privilege." 384 U. S., at 476. And, as that portion of *Miranda* which the majority finds controlling observed, "the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." *Id.*, at 474. Thus, as to statements which are the product of renewed questioning, *Miranda* established a virtually irrebuttable presumption of compulsion, see *id.*, at 474 n. 44, and that presumption stands strongest where, as in this case, a suspect, having initially determined to remain silent, is subsequently brought to confess his crime. Only by adequate procedural safeguards could the presumption be rebutted.

In formulating its procedural safeguard, the Court skirts the problem of compulsion and thereby fails to join issue with the dictates of *Miranda*. The language which the Court finds controlling in this case teaches that renewed questioning itself is part of the process which invariably operates to overcome the will of a suspect. That teaching is embodied in the form of a proscription on any further questioning once the suspect has exercised his right to remain silent. Today's decision uncritically abandons that teaching. The Court assumes, contrary to the controlling language, that "scrupulously honoring" an initial exercise of the right to remain silent preserves the efficaciousness of initial and future warnings despite the fact that the suspect has once been subjected to interrogation and then has been detained for a lengthy period of time.

Observing that the suspect can control the circumstances of interrogation "[t]hrough the exercise of his option to terminate questioning," the Court concludes "that the admissibility of statements obtained after the person in custody has decided to remain silent depends . . .

on whether his 'right to cut off questioning' was 'scrupulously honored.' " *Ante,* at 103, 104. But scrupulously honoring exercises of the right to cut off questioning is only meaningful insofar as the suspect's will to exercise that right remains wholly unfettered. The Court's formulation thus assumes the very matter at issue here: whether renewed questioning following a lengthy period of detention acts to overbear the suspect's will, irrespective of giving the *Miranda* warnings a second time (and scrupulously honoring them), thereby rendering inconsequential any failure to exercise the right to remain silent. For the Court it is enough conclusorily to assert that "[t]he subsequent questioning did not undercut Mosley's previous decision not to answer Detective Cowie's inquiries." *Ante,* at 105. Under *Miranda,* however, Mosley's failure to exercise the right upon renewed questioning is presumptively the consequence of an overbearing in which detention and that subsequent questioning played central roles.

I agree that *Miranda* is not to be read, on the one hand, to impose an absolute ban on resumption of questioning "at any time or place on any subject," *ante,* at 102, or on the other hand, "to permit a resumption of interrogation after a momentary respite," *ibid.* But this surely cannot justify adoption of a vague and ineffective procedural standard that falls somewhere between those absurd extremes, for *Miranda* in flat and unambiguous terms requires that questioning "cease" when a suspect exercises the right to remain silent. *Miranda*'s terms, however, are not so uncompromising as to preclude the fashioning of guidelines to govern this case. Those guidelines must, of course, necessarily be sensitive to the reality that "[a]s a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investiga-

tions, where there are often impartial observers to guard against intimidation or trickery." 384 U. S., at 461 (footnote omitted).

The fashioning of guidelines for this case is an easy task. Adequate procedures are readily available. Michigan law requires that the suspect be arraigned before a judicial officer "without unnecessary delay," [2] certainly not a burdensome requirement. Alternatively, a requirement that resumption of questioning should await appointment and arrival of counsel for the suspect would be an acceptable and readily satisfied precondition to resumption.[3] *Miranda* expressly held that "[t]he presence of counsel . . . would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege [against self-incrimination]." *Id.,* at 466. The Court expediently bypasses this alternative in its search for circumstances where renewed questioning would be permissible.[4]

Indeed, language in *Miranda* suggests that the

[2] Mich. Comp. Laws §§ 764.13, 764.26 (1970); Mich. Stat. Ann. §§ 28.871 (1), 28.885 (1972). Detective Cowie's testimony indicated that a judge was available across the street from the police station in which Mosley was held from 2:15 p. m. until 4 p. m. or 4:30 p. m. App. 13. The actual interrogation of Mosley, however, covered only 15 or 20 minutes of this time. *Id.,* at 14. The failure to comply with a simple state-law requirement in these circumstances is totally at odds with the holding that the police "scrupulously honored" Mosley's rights.

[3] In addition, a break in custody for a substantial period of time would permit—indeed it would require—law enforcement officers to give *Miranda* warnings a second time.

[4] I do not mean to imply that counsel may be forced on a suspect who does not request an attorney. I suggest only that either arraignment or counsel must be provided before resumption of questioning to eliminate the coercive atmosphere of in-custody interrogation. The Court itself apparently proscribes resuming questioning until counsel is present if an accused has exercised the right to have an attorney present at questioning. *Ante,* at 101 n. 7.

presence of counsel is the only appropriate alternative. In categorical language we held in *Miranda:* "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.,* at 473–474. We then immediately observed:

> "If an individual indicates his desire to remain silent but has an attorney present, there *may* be some circumstances in which further questioning would be permissible. In the absence of evidence of overbearing, statements then made in the presence of counsel *might* be free of the compelling influence of the interrogation process and *might* fairly be construed as a waiver of the privilege for purposes of these statements." *Id.,* at 474 n. 44 (emphasis added).

This was the only circumstance in which we at all suggested that questioning could be resumed, and even then, further questioning was not permissible in all such circumstances, for compulsion was still the presumption not easily dissipated.[5]

---

[5] The Court asserts that this language is not relevant to the present case, for "Mosley did not have an attorney present at the time he declined to answer Detective Cowie's questions." *Ante,* at 102 n. 8. The language, however, does not compel a reading that it is applicable only if counsel is present when the suspect initially exercises his right to remain silent. Even if it did, this would only indicate that *Miranda* placed even stiffer limits on the circumstances when questioning may be resumed than I suggest here. Moreover, since the concern in *Miranda* was with assuring the absence of compulsion upon renewed questioning, it makes little difference whether counsel is initially present. Thus, even if the language does not specifically address the situation where counsel is not initially present, it certainly contemplates that situation.

The Court also asserts that *Miranda* "directed that 'the interrogation must cease until an attorney is present' only '[i]f the individual states that he wants an attorney.'" *Ante,* at 104 n. 10

These procedures would be wholly consistent with the Court's rejection of a *"per se* proscription of indefinite duration," *ante,* at 102, a rejection to which I fully subscribe. Today's decision, however, virtually empties *Miranda* of principle, for plainly the decision encourages police asked to cease interrogation to continue the suspect's detention until the police station's coercive atmosphere does its work and the suspect responds to resumed questioning.[6] Today's rejection of that reality of life contrasts sharply with the Court's acceptance only two years ago that "[i]n *Miranda* the Court found that the techniques of police questioning and the nature of custodial surroundings produce an inherently coercive situation." *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 247 (1973). I can only conclude that today's decision signals rejection of *Miranda*'s basic premise.

My concern with the Court's opinion does not end with its treatment of *Miranda,* but extends to its treatment of the facts in this case. The Court's effort to have the Williams homicide appear as "an unrelated holdup murder," *ante,* at 104, is patently unsuccessful. The anonymous tip received by Detective Cowie, conceded by the Court to be the sole basis for Mosley's arrest, *ante,* at 97 n. 1, embraced both the robberies covered in Cowie's in-

---

(quoting 384 U. S., at 474). This is patently inaccurate. The language from the quoted portion of *Miranda* actually reads: "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."

[6] I do not suggest that the Court's opinion is to be read as permitting unreasonably lengthy detention without arraignment so long as any exercise of rights by a suspect is "scrupulously honored." The question of whether there is some constitutional limitation on the length of time police may detain a suspect without arraignment, cf. *Gerstein* v. *Pugh,* 420 U. S. 103 (1975); *Mallory* v. *United States,* 354 U. S. 449 (1957); *McNabb* v. *United States,* 318 U. S. 332 (1943), is an open one and is not now before the Court.

terrogation and the robbery-murder of Williams, *ante,* at 98 n. 2, about which Detective Hill questioned Mosley. Thus, when Mosley was apprehended, Cowie suspected him of being involved in the Williams robbery-murder in addition to the robberies about which he tried to examine Mosley. On another matter, the Court treats the second interrogation as being "at another location," *ante,* at 104. Yet the fact is that it was merely a different floor of the same building, *ante,* at 97–98.[7]

I also find troubling the Court's finding that Mosley never indicated that he did not want to discuss the robbery-murder, see *ante,* at 104–106. I cannot read Cowie's testimony as the Court does. Cowie testified that Mosley

---

[7] See *Westover* v. *United States,* 384 U. S. 436, 494 (1966), where Westover confessed after being turned over to the FBI following questioning by local police. We said:

"Although the two law enforcement authorities are legally distinct and the crimes for which they interrogated Westover were different, the impact on him was that of a continuous period of questioning. . . .

"We do not suggest that law enforcement authorities are precluded from questioning any individual who has been held for a period of time by other authorities and interrogated by them without appropriate warnings. A different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them. But here the FBI interrogation was conducted immediately following the state interrogation in the same police station—in the same compelling surroundings. Thus, in obtaining a confession from Westover the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation. In these circumstances the giving of warnings alone was not sufficient to protect the privilege." *Id.,* at 496–497.

It is no answer to say that the questioning was resumed by a second police officer. Surely *Santobello* v. *New York,* 404 U. S. 257, 262 (1971), requires that the case be decided as if it involved two interrogation sessions by a single law enforcement officer.

declined to answer " '[a]nything about the robberies,' " *ante,* at 105 n. 11. That can be read only against the background of the anonymous tip that implicated Mosley in the Williams incident. Read in that light, it may reasonably be inferred that Cowie understood "[a]nything" to include the Williams episode, since the anonymous tip embraced that episode. More than this, the Court's reading of Cowie's testimony is not even faithful to the standard it articulates here today. "Anything about the robberies" may more than reasonably be interpreted as comprehending the Williams murder which occurred during a robbery. To interpret Mosley's alleged statement to the contrary, therefore, hardly honors "scrupulously" the suspect's rights.

In light of today's erosion of *Miranda* standards as a matter of federal constitutional law, it is appropriate to observe that no State is precluded by the decision from adhering to higher standards under state law. Each State has power to impose higher standards governing police practices under state law than is required by the Federal Constitution. See *Oregon* v. *Hass,* 420 U. S. 714, 719 (1975);[8] *Lego* v. *Twomey,* 404 U. S. 477, 489 (1972); *Cooper* v. *California,* 386 U. S. 58, 62 (1967). A decision particularly bearing upon the question of the adoption of *Miranda* as state law is *Commonwealth* v. *Ware,* 446 Pa. 52, 284 A. 2d 700 (1971). There the Pennsylvania Supreme Court adopted an aspect of *Miranda* as state law. This Court on March 20,

---

[8] Although my Brother MARSHALL correctly argued in *Hass,* 420 U. S., at 728 (dissenting), that we should have remanded for the state court to clarify whether it was relying on state or federal law, such a disposition is not required here. In *Hass* the state court cited both federal and state authority; in this case Mosley's counsel has conceded that the self-incrimination argument in the state court was based solely on the Fifth Amendment to the Federal Constitution. Tr. of Oral Arg. 44.

1972, granted the Commonwealth's petition for certiorari to review that decision. 405 U. S. 987. A month later, however, the error of the grant having been made apparent, the Court vacated the order of March 20, "it appearing that the judgment below rests upon an adequate state ground." 406 U. S. 910. Understandably, state courts and legislatures are, as matters of state law, increasingly according protections once provided as federal rights but now increasingly depreciated by decisions of this Court. See, e. g., State v. Santiago, 53 Haw. 254, 492 P. 2d 657 (1971) (rejecting Harris v. New York, 401 U. S. 222 (1971)); People v. Beavers, 393 Mich. 554, 227 N. W. 2d 511 (1975), cert. denied, post, p. 878 (rejecting United States v. White, 401 U. S. 745 (1971)); State v. Johnson, 68 N. J. 349, 346 A. 2d 66 (1975) (rejecting Schneckloth v. Bustamonte, 412 U. S. 218 (1973)); Commonwealth v. Campana, 455 Pa. 622, 314 A. 2d 854, cert. denied, 417 U. S. 969 (1974) (adopting "same transaction or occurrence" view of Double Jeopardy Clause). I note that Michigan's Constitution has its own counterpart to the privilege against self-incrimination. Mich. Const., Art. 1, § 17; see State v. Johnson, supra.