Chris **BROWNFIELD** and Arthur Neal Owens, Appellants,

v.

The **STATE** of Oklahoma, Appellee.

No. F–81–667.

Court of Criminal Appeals of Oklahoma.

Aug. 29, 1983.

Johnie O'Neal, Asst. Public Defender, Tulsa, for appellants.

Jan Eric Cartwright, Atty. Gen., Mary F. Williams, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

CORNISH, Judge:

On February 7, 1980, two men, posing as prospective purchasers, were admitted to the home of Ms. Fanny Wilson in Tulsa, Oklahoma. After a tour of the house, they robbed Ms. Wilson and her teenage son at gunpoint, taking, among other property, a handgun. On April 17, 1980, Chris Brownfield and Arthur Neal Owens were arrested in Henryetta, Oklahoma, on an unrelated theft complaint. A search of their car revealed several handguns, including one believed to have been stolen in the Wilson robbery.

On April 23, 1980, Ms. Wilson journeyed to Okmulgee County and identified Brownfield and Owens in a line-up as the robbers. On May 15, 1980, Tulsa County officers transported the men from the Okmulgee County jail back to Tulsa County. While en route, they questioned the defendants about the crime. The defendants eventually made statements incriminating themselves in the crime.

At trial, the principal evidence against the defendants was the identification testimony of Ms. Wilson, the handgun recovered from the defendants' vehicle, and the incriminating statements. The jury convicted the defendants of Robbery with Firearms, and set punishment at fifty-five (55) years in prison for each man.

The relevant suppression hearing testimony of the interrogating officer is set

out in the Appendix.[1] It appears that after the defendants were placed in the officers' vehicle for the ride back to Tulsa, they were advised of their *Miranda* rights. The defendants then said that they did not want to discuss the crime. They said that "their employer was an extremely bad individual [a]nd they could not talk about it for fear of their life (sic)."

The officers continued to interrogate the defendants in an effort to discover the name of the employer. The defendants eventually revealed the individual's identity, and the officers then endeavored to convince the men that the employer was not as bad as they supposed. The defendants finally confessed their roles in the crime.

We hold that the incriminating statements were used against the defendants in clear violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Miranda,* the Supreme Court stated:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

384 U.S. at 473–74, 86 S.Ct. at 1627–28. (footnote omitted.)

It is manifest that the men indicated their desire to remain silent. Their subsequent statement that they were motivated by fear fortified rather than contradicted their indication of silence. Under such circumstances,

> [t]he admissibility of statements obtained after the person in custody has decided to

remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'

*Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). The officers wholly failed to respect the appellants' right to cut off questioning, since there was no interruption in the interrogation after the men indicated that they wished to remain silent.

We find that the trial court erred in failing to suppress the inculpatory statements elicited from the defendants while en route from Okmulgee County to Tulsa County. However, such error does not require reversal if harmless in light of the other evidence of the appellants' guilt. See, *United States v. Hernandez,* 574 F.2d 1362 (5th Cir.1978).

■ Aside from the confessions, the State's case rested upon the identification testimony of Ms. Wilson and the handgun seized from the defendants. We reject the contention that Ms. Wilson's identification testimony should have been suppressed. Although she was exposed to rather suggestive pretrial identification procedures by police investigators, the record clearly reflects that her testimony was independently reliable. See, *Green v. State,* 594 P.2d 767 (Okl. Cr.1979). She had an excellent opportunity to view the criminals at the time of the crime. She conducted the men on a fifteen minute tour of the house prior to the time they pulled their weapons. The men were in the house a total of about one hour during the crime. Moreover, defendant Owens had visited the house the day before the crime for twelve to fifteen minutes, arranging an appointment to see the house.

There is nothing to indicate that Ms. Wilson's attention was distracted during the substantial periods of time she was in the presence of the robbers. She gave highly detailed descriptions of the perpetrators to the investigators, and her estimates of height, weight and age were remarkably accurate with respect to these defendants. At the line-up, she identified the defend-

---

1. See Appendix.

ants without serious difficulty, although expressing misgivings over certain changes in their appearance. The line-up occurred some five or seven weeks after the crime.

 However, the State was impermissibly allowed to bolster Ms. Wilson's identification testimony over objection of the defendants. One of the investigating officers was allowed to testify as follows:

Q. Who viewed the lineup?

A. Fanny Wilson.

Q. Did she make any identification?

A. Yes, sir, she did.

Q. Who did she identify.

MR. MCCARTHY: To which I object.

THE COURT: Objection overruled?

A. She identified Christopher Brownfield and Arthur Owens.

MR. MCCARTHY: Excuse me, I ask jury be admonished to disregard that answer and move for a mistrial.

THE COURT: Will be denied.

\* \* \* \* \* \*

BY MR. BAKER:

Q. Mike, during your time as law enforcement officer, how many lineups would you say you've either put together or attended?

A. Mr. Baker, it would be up in the hundreds.

Q. You've had a lot of victims of crimes looking at lots of lineups?

A. Yes, I have.

Q. You've had an occasion where some victims who could not make an identification in a lineup; is that true?

A. Absolutely.

Q. From your investigation in this case in Okmulgee having the victim view photographs here was there ever any doubts in your mind her identification was shakey or unsure?

MR. MCCARTHY: To which I object what's in this officer's mind.

MR. BAKER: He went into it, Your Honor, in pretty great detail.

THE COURT: Objection overruled?

A. There was none whatever.

MR. MCCARTHY: I ask the jury be admonished to disregard the answer and and move for a mis-trial.

THE COURT: Will be denied.

(Tr. 144–145; 180–181). Testimony that an extrajudicial identification was made may be admitted, but it is limited to the identifying witness herself, not third persons present at the time of the identification. *Maple v. State,* 662 P.2d 315 (Okl.Cr.1983).

 Similarly, the State was improperly allowed to bolster the identification of the handgun as that stolen in the robbery. An investigating officer was permitted to testify over a hearsay objection that he obtained a serial number for the stolen revolver, "number 72369", which matched the serial number of the weapon seized from the defendants' car. "Hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted ...." 12 O.S.1981, § 2801(3). The officer's testimony was clearly hearsay, and should have been excluded.

The only other evidence identifying the pistol was Ms. Wilson's statement that the gun "looks like the size of the gun that was in my drawer." Since the lack of positive identification goes to the weight of the evidence, see, *Gouard v. State,* 335 P.2d 920 (Okl.Cr.1959), the improper use of the serial number link may well have influenced the jury's consideration of the significance of the handgun.

 The defendants' incriminating statements were admitted in violation of *Miranda v. Arizona,* supra. Both of the other crucial items of evidence against the defendants were supported by the use of inadmissible evidence. We are unable to conclude that the improper use of the confessions was harmless beyond a reasonable doubt. The judgment and sentence is REVERSED and the cause REMANDED for new trial.

BRETT, J., concurs.

BUSSEY, P.J., dissents.

APPENDIX

Q. When was the next time you saw them?

A. 5–15–80

Q. What purpose?

A. Transported both to the Tulsa County jail on a felony warrant.

Q. Anyone with you during the transport?

A. Deputy Sheriff Gary James.

 * * * * * *

Q. Prior to transporting, had the defendants been advised of their Miranda rights?

A. Yes, sir.

Q. Did you have a discussion with them during the ride from Okmulgee about the Wilson armed robbery?

A. Yes, sir.

Q. What did they tell you; which one told you what?

A. We spoke about many things. First of all they advised they didn't wish to speak about the armed robbery. But before arriving at Tulsa, they advised me and deputy James they had committed that armed robbery. They had been contract men to commit that armed robbery. They had received the sum of five hundred dollars from their employer.

 * * * * * *

Q. You indicated you advised them of the *Miranda* rights?

A. Officer James advised them of their *Miranda* Rights; he was sitting in the back seat with one of them at first Mr. Brownfield, who was using the name Mark Anthony Tullis. He advised each of them separately of their Miranda Rights and conjointly. He asked if they understood the rights; they said: yes.

 * * * * * *

Q. You indicate they first said they didn't want to talk about robbery?

A. That's correct.

Q. Who said that?

A. The one sitting in the back seat said it first.

Q. Mr. Brownfield?

A. I don't remember; I think Mr.—I don't remember which was sitting in front or back. They advised their employer was an extremely bad individual. And they could not talk about it for fear of their life.

Q. Was that their only statement?

A. At that point in time?

Q. Yes, sir?

A. Yes. If they talk about or tell about it, we are dead.

Q. All right, did you respond to that?

A. Correct.

Q. What did you say?

A. I said I wasn't aware of anyone that bad in Tulsa, Oklahoma; all the bad ones had been locked up.

Q. What did they say?

A. He's really bad.

Q. What did you say?

A. He is bad as so and so or so and so and their response to that was they wouldn't make a wart on his butt.

Q. What did you say?

Q. Who is this bad guy, Jake Loggins.

Q. They responded?

A. Yes, they responded.

Q. What did you say?

A. Officer James laughed about five minutes and said he had handled Jake Loggins; it wasn't bad at all.

Q. What did they say?

A. We know of people he's had done. We know of all the merchandise he has at his house. He can get anyone killed for no money at all and they told us how bad he was, how many years involved in criminal acts in Tulsa and tri-states area surrounding Tulsa.

Q. Did Officer James respond?

A. Spoke about many things driving from Okmulgee to Tulsa?

Q. Did you assure them he wasn't so bad he could hurt them?

A. Advised them he wasn't as near as bad as they thought he was.

Q. This conversation all transpiring after they told they don't want to talk about the armed robbery?

A. That's correct. (Tr. 99–104).

BUSSEY, Presiding Judge, dissenting:

The defendants' assertion that they did not wish to answer further questioning regarding their employer was not, in my mind, a categorical expression of a desire to remain silent; rather, it was a reluctance to inculpate their employer, of whom they were afraid. That they were subsequently persuaded to inculpate him (and themselves) by the officers, was not a violation of the *Miranda* decision.