OPINION OF THE COURT
William Garnett, J.
On May 18, 1993, this court conducted a combined Dunaway, Huntley and refusal hearing.
The only witnesses were Police Officers Iacampo and Friscia. I find their testimony to have been credible.
The court makes the following findings of fact:
On November 20, 1992, at approximately 2:10 p.m., Officer Iacampo was summoned to the scene of an auto accident on the Staten Island Expressway. Two vehicles, a 1979 Mercedes Benz and 1989 Ford van, had been involved in the accident. The Emergency Medical Service (E.M.S.) was already at the scene when the police arrived. The sky was clear and the roadway dry.
The operator of the Ford and his passenger told the officer that the Mercedes Benz had swerved into the van’s lane and struck the van and, as the Mercedes Benz attempted to make an adjustment, the Mercedes Benz hit the van a second time. Thereafter, the operator of the Mercedes Benz, the defendant, apparently lost control of his vehicle and hit the guardrail. Both of these individuals told the officer that the defendant was intoxicated.
The officer then spoke to the defendant who was in an E.M.S. ambulance. The defendant’s speech was slurred, his eyes bloodshot and there was an odor of alcohol on his breath. The defendant was taken to the hospital for medical treatment. The officer did not accompany the defendant to the hospital in the ambulance.
At the hospital, at approximately 4:15 p.m., Police Officer Iacampo asked the defendant to take an alcosensor test. The defendant agreed and the reading was .14. At that time, 4:20 p.m., the defendant was placed under arrest. Police Officer *673 Iacampo advised the defendant of his Miranda rights by reading from the front cover of his memobook which included the warnings. A copy of that cover was entered into evidence. The defendant was given his rights and he acknowledged that he understood them. However, he didn’t waive his right to be silent as he refused to answer any questions.
Only five minutes later, and without repeating the warnings, the officer began to ask the defendant questions to complete the PD 244 form (Intoxicated Drivers Examination). Those questions included material which would not be characterized as mere pedigree information. In fact, it was these statements which were the subject of the CPL 710.30 (1) (a) notice in this case.
Police Officer Friscia had been called to the hospital at about 3:30 p.m. to bring the alcosensor and to administer a blood test. After the defendant took the alcosensor test, the officer offered the defendant a blood test. The officer advised the defendant of the consequences of his refusal. The defendant was informed of the effect his refusal would have on his license and that, moreover, his refusal would be used as evidence at any subsequent trial. The defendant refused to take the blood test. Officer Friscia noted that the defendant had the odor of alcohol on his breath and that his eyes were bloodshot.
Approximately one hour after the defendant had refused to take the blood test, but still within two hours of his arrest, the defendant said he would take the test. No test was performed.
CONCLUSIONS OF LAW
When Police Officer Iacampo placed the defendant under arrest he had probable cause to do so. The defendant had been involved in a two-car accident in which he had apparently lost control of his vehicle and had swerved into the lane of traffic occupied by another vehicle. The defendant had bloodshot eyes, the odor of alcohol on his breath, slurred speech and had produced an alcosensor reading of .14. These facts provided probable cause for the officer to conclude that the defendant had been driving while intoxicated.
The court concludes that the defendant’s statements made in response to Police Officer Iacampo’s questions must be suppressed. The defendant was advised of Miranda warnings but refused to answer the questions.
Only five minutes later, and without reiterating the warn *674 ings, Officer Iacampo questioned the defendant for the purpose of completing the PD 244 form — the Intoxicated Driver Examination form. These questions encompassed material which went beyond mere pedigree information.
A defendant who initially refused to answer questions after the administration of Miranda warnings may thereafter be questioned if he or she is again advised of his or her rights and his or her initial refusal to answer questions was "scrupulously honored”. (Michigan v Mosley, 423 US 96, 103 [1975]; People v Cyrus, 170 AD2d 526 [2d Dept 1991].) Further, there must have been a pronounced break between periods of questioning. (People v Bethea, 67 NY2d 364 [1986]; People v Chapple, 38 NY2d 112 [1975].)
In this case, after the defendant refused to answer questions, his refusal was not "scrupulously honored”. The officer, without reiterating the warnings, commenced questioning the defendant only five minutes after his first refusal. Further, the brief interlude between the defendant’s refusal to answer inquiries and the inception of the questioning was not a pronounced break between the defendant’s invocation of his right to remain silent and the commencement of police interrogation.
Therefore, the statements made by the defendant in response to Officer Iacampo’s questions for nonpedigree information are suppressed.
Next, defense counsel argued that the defendant’s decision to submit to a blood test one hour after he had initially refused renders evidence of his initial refusal inadmissible. The defendant was clearly and unequivocally warned of the consequences of his refusal to take the blood test including its use as evidence at any subsequent trial.
Evidence of a defendant’s refusal to take a chemical test is relevant to demonstrate a defendant’s consciousness of guilt. (People v Thomas, 46 NY2d 100, 108, 109, n 2 [1978].) The trier of fact may infer from this evidence that a defendant refused to take the test to prevent "risking disclosure of whatever the test might have revealed as to the alcoholic content of his blood.” (People v Thomas, supra, at 108.) The fact finder is free to accept or reject the inference of a consciousness of guilt based on all of the evidence in the case. "Proof * * * that might be explanatory of a particular defendant’s refusal to take the test unrelated to any apprehension as to its results * * * should be treated not as tending to *675 establish any form of compulsion but rather as going to the probative worth of the evidence of refusal.” (People v Thomas, supra, at 109, n 2.) Thus, any evidence which would explain the defendant’s refusal to take the chemical test is relevant on the issue of the weight to be accorded the defendant’s refusal by the trier of fact but irrelevant on the issue of the refusal’s admissibility.
The defendant’s subsequent willingness to have a blood test performed does not affect the admissibility of the defendant’s prior refusal. The fact that the test could have been performed when the defendant agreed does not undermine the admissibility of the refusal. The defendant’s later recantation of an earlier refusal doesn’t "suffice to undo that refusal” (Matter of Nicol v Grant, 117 AD2d 940, 941 [3d Dept 1986]; Matter of O’Brien v Melton, 61 AD2d 1091 [3d Dept 1978]). Every driver impliedly consents to a chemical test within statutory limits. (Vehicle and Traffic Law § 1194 [2].)
If a defendant were able to first refuse a test and then slightly less than two hours later acquiesce in a chemical test, a defendant would be able to evade and eviscerate the implied consent provision with impunity. If, for example, the defendant initially refused the test and then agreed, he or she would be relieved of the consequences of the initial refusal. Second, if a defendant subsequently agreed and an officer were available to administer a test, then the defendant would have escaped the consequences of the initial refusal and, at least, reduced the impact of the results of the chemical test. Further, interpreting the statutory scheme to absolve the defendant of an initial refusal, if the defendant reverses course within two hours of arrest, would require trained police personnel to babysit a defendant for two hours while other charged drivers, guilty or not guilty, wait for an available technician while the evidentiary impact of their chemical tests is lessened by the passage of time.
The two-hour limit is not a statutorily imposed period for a defendant’s deliberation on the strategic and practical consequences of a refusal to submit to a chemical test.
Thus, the defendant’s initial refusal, after having been clearly and unequivocally advised as to the consequences of that refusal, stands as evidence of a consciousness of guilt despite a subsequent change of mind. The defendant may, if he or she chooses, explain to the trier of fact his reasons for refusing to take the test when offered and may, of course, *676 testify to his later willingness to take the blood test in order to soften or obviate the impact of the evidence of the refusal. Plainly, this testimony might convince the trier of fact not to infer a consciousness of guilt from the defendant’s refusal to take the test. However, these same facts do not render evidence of the refusal inadmissible at trial.
In summary, there was probable cause for the arrest of the defendant, the nonpedigree answers obtained in response to questions on the PD 244 form are suppressed and the People may use the defendant’s refusal to take the blood test as evidence.