OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of the State of Ohio, filed November 27, 2006. On August 18, 2006, Appellee Michael Vanderpool was indicted *Page 2 
on nine counts of rape of a child under 13, in violation of R.C.2907.02(A)(1)(b). On August 29, 2006, Vanderpool filed a Motion to Suppress statements made by him to Jerome Dix, a detective in the Dayton Special Victim's Unit. On August 10, 2006, Dix responded to a Huber Heights, Ohio, address and arrested Vanderpool there after interviewing the victim and her parents at CARE House. On November 21, 2006, the trial court granted Vanderpool's Motion to Suppress.
 {¶ 2} The State asserts one assignment of error as follows:
 {¶ 3} "THE TRIAL COURT ERRED BY SUPPRESSING VANDERPOOL'S STATEMENTS."
 {¶ 4} "Appellant courts give great deference to the factual findings of the trier of facts. (Internal citations omitted). At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence. (Internal citations omitted)." State v. Purser, Greene App. No. 2006 CA 14,2007-Ohio-190.
 {¶ 5} When a defendant is subject to a custodial interrogation, he must be advised of his rights pursuant to Miranda v. Arizona (1966),384 U.S. 436, 86 S.Ct. 1602, 16 *Page 3 
L.Ed.2d 694. "Once the warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the questioning must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." Id., at 473-474; Michigan v. Mosley, 423, U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313.
 {¶ 6} Whether any subsequent waiver of a defendant's Miranda rights is given freely and voluntarily is a question of fact. North Carolina v.Butler (1979), 441 U.S. 369, 373. "[T]he State must establish by a preponderance of the evidence (1) that the accused relinquished his right voluntarily in the sense that `it was the product of a free choice rather than intimidation, coercion, or deception,' and (2) that he waived `with full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it.'" State v.Amann (Sept. 7, 1990), Montgomery App. No. 11446.
 {¶ 7} At the time of the interview, Dix reviewed Vanderpool's Miranda rights by use of a pre-interview form. Dix read Vanderpool's rights to him and Vanderpool initialed each one to acknowledge his understanding thereof. Vanderpool did not have any questions. After Vanderpool signed the waiver of rights section of the form, Dix began the interview.
 {¶ 8} Vanderpool repeatedly told Dix that he did not want to answer any questions regarding the alleged rape(s) of the victim. Dix persisted in questioning Vanderpool about *Page 4 
the alleged rape(s), even though Vanderpool reiterated that he did not want to answer such questions. At the hearing on the Motion to Suppress, the following exchange occurred during Dix's cross-examination:
 {¶ 9} "A. * * * I can just tell you the fact of this is that when I would ask him a direct question that was in correlation with the investigation that was a specific question, those are the questions that on occasions he'd stand there and say, I'm not going to answer that question.
 {¶ 10} "Q. * * * So, he answered your questions about his name, address, social security number and things of that nature, but any time you wanted to accuse him of having sex with this child he said he didn't want to answer your questions; is that correct?
 {¶ 11} "A. That's about right.
 {¶ 12} "* * *
 {¶ 13} "Q. What specific questions did he not want to answer?
 {¶ 14} "A. Any question that would implicate or be pertained to the rape of [the victim]."
 {¶ 15} Dix went on to state, "It was during the course of the interview that I basically tricked him and * * * I got him into — he was adamantly defending himself in reference to that he did nothing wrong, at which point in time I told him that I was going to get up from the interview room and I'm going to call [the victim]. And — and I told him flat out, I said, now, when I call [the victim] I don't want to make myself look like an ass. So make — I want to make sure I'm perfectly clear on this.
 {¶ 16} "I said, so when I call [the victim], she's going to tell me that the three times that she gave you oral sex while driving around in the trucks — in the truck, that was all *Page 5 
consensual on her part. And Michael says yes. I then also told him so — so that I make sure I'm perfectly clear on this, that the time you were in the hotel — when you had sex with her in the hotel room and that she performed oral sex on you in the hotel room, she didn't complain about that and she was willing to do that. And he said exactly."
 {¶ 17} At another point in the interview, Vanderpool indicated to Dix that he had an attorney:
 {¶ 18} "A. * * * [Vanderpool] basically said that [the victim] can even choose-accuse him of whatever he wanted to and that he's got John Rion and John will get him off.
 {¶ 19} "* * *
 {¶ 20} "Q. And this — this was during the time he was telling you he didn't want to answer any of your questions about her?
 {¶ 21} "A. I don't recall exactly when that came out. I know that's when things started getting a little hot and I turned up the heat on him a little bit to where it was getting a little verbally confrontational to get him off key and off balance.
 {¶ 22} "Q. * * * But I guess what I'm trying to understand, in the same interview he mentioned my name, John Rion, a lawyer, and he refused to answer questions somewhere less than 20 times. Now, is that sequence correct?
 {¶ 23} "A. I don't know if the sequence is correct, but all those things in there are parts of the interview, yes."
 {¶ 24} The trial court determined, and we agree, that Dix adequately advised Vanderpool of his rights, and Vanderpool understood them as well as the consequences of signing the waiver. The record makes clear, however, as the trial court correctly noted, that "the statements were obtained by deception at a time that the Defendant had repeatedly *Page 6 
refused to answer questions and he had stated that he was represented by counsel." Although Vanderpool did not request counsel when he referred to John Rion, thereby mandating the presence of counsel before questioning continued, Vanderpool did in fact invoke his right to remain silent repeatedly regarding the alleged offenses. Dix testified that Vanderpool refused to answer any questions about the alleged rapes numerous times, and that Dix "tricked" Vanderpool into discussing the alleged rapes when Vanderpool clearly exercised his right to cut off questioning regarding them. Since the State did not prove that the statements were constitutionally obtained, the State's assignment of error is overruled. Judgment Affirmed.
 FAIN, J. and GRADY, J., concur. *Page 1