Argued and submitted March 17, affirmed August 18, 1980

STATE OF OREGON,
*Respondent,*
*v.*
RICHARD ORSON GROOMS,
*Appellant.*

(No. C 78-09-14303, CA 13412)

615 P2d 1130

Marianne Bottini, Deputy Public Defender, argued the cause for appellant. With her on the brief was Gary D. Babcock, Public Defender, Salem.

Robert C. Cannon, Assistant Attorney General, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, and Joseph, Warden and Warren, Judges.

WARREN, J.

## WARREN, J.

Defendant waived a jury and was convicted by the court of aggravated murder. ORS 163.095.[1] On appeal, he contends that the trial court erred in denying his motion to suppress his confession. He also contends that ORS 163.095, the aggravated murder statute, is an unconstitutional denial of equal protection because aggravated murder while in the course of committing a felony is indistinguishable from felony murder except for the penalty which may be imposed.

On August 14, 1978, Edward Klemmer died from multiple head wounds caused by being struck several times with a hammer. Defendant was a prime suspect. On August 30, 1978, defendant was arrested on outstanding theft warrants in Lynwood, Washington. He was advised of his rights under *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR 3d 974 (1966), and indicated that he did not wish to talk. Oregon authorities were notified of defendant's arrest and went to Lynwood where, prior to any questioning, the Oregon detectives again advised defendant of his constitutional rights. At this time, defendant agreed to talk and signed a formal waiver of his rights.[2]

---

[1] ORS 163.095 provides in pertinent part:

"As used in ORS 163.105 and this section, 'aggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:

"* * * * *

"(d) The defendant personally committed the homicide in the course or in the furtherance of the crime of robbery in any degree, kidnapping or arson in the first degree, any sexual offense specified in this chapter, or in immediate flight therefrom.

"* * * * *"

[2] The waiver of rights form signed by defendant stated:

"* * * * *

During the course of his questioning, defendant admitted striking Klemmer several times with a hammer. After this confession, the detective requested defendant's permission to make a taperecording of the previous confession to which defendant agreed. During the taping of the confession, defendant was again advised of his *Miranda* rights, and in response to the detective's question as to whether he wished the presence of an attorney, defendant stated "[he didn't] know." The detective then asked if he could continue his questioning:

"DEFENDANT: Sure.

"DETECTIVE WEBER: Are you sure now?

"DEFENDANT: Yes sir.

"DETECTIVE WEBER: You've thought about it?

"DEFENDANT: Yes, sir."

Defendant then repeated his previous confession.

■ Defendant's equivocal response to Detective Weber's questioning as to whether he wanted an attorney present did not amount to a request for an attorney and did not require questioning to cease. *Michigan v. Mosley,* 423 US 96, 96 S Ct 321, 46 L Ed 2d 313, 321 n 10 (1976).[3]

---

"I have read this statement of my rights and am fully aware of these rights.

"I am willing to answer questions asked of me.

"I do not desire the presence of a lawyer at this time.

"This statement is signed of my own free will without any threats or promises having been made of me.

"* * * * *"

[3] We conclude that defendant's equivocal statement concerning whether or not he wanted an attorney was not a request for an attorney which required the interrogation to cease pending defendant obtaining counsel. Even if viewed as a request for counsel, however, it is apparent that defendant "changed his mind." As we stated in *State v. Dyke,* 19 Or App 705, 528 P2d 1073 (1974):

Defendant did not contend that he did not receive or understand his *Miranda* rights. On trial, defendant's sole contention was that the confession was not voluntary.

■ After conducting a *State v. Brewton* [238 Or 590, 395 P2d 874, (1964)] hearing on the voluntariness issue, the trial court concluded that the confession was voluntary. The evidence is overwhelming that defendant had been fully advised of his rights and had elected to waive them. There was no evidence that the taped confession was other than voluntarily made. In any event, no contention is made that the previous oral confession was not made voluntarily after defendant was advised of his rights.

■ Defendant also claims that after he asserted his right to remain silent and declined to discuss the outstanding theft warrants with the Washington detectives, he could not be subsequently questioned by the Oregon detectives concerning the murder of Klemmer. That contention is without merit. In *Michigan v. Mosley, supra,* the defendant declined to answer any questions concerning two robberies. Questioning about the robberies ceased and was not resumed. Later, after being again advised of his *Miranda* rights and signing a waiver form, Mosley was questioned concerning a homicide to which he confessed. The Supreme Court, in holding that the confession was admissible, stated:
    "* * * * *

    "A reasonable and faithful interpretation of the Miranda opinion must rest on the intention of the

---

"* * * the law does not prohibit [the suspect] from changing his mind. * * * [T]he police are entitled to ask him if he has changed his mind, but * * * they cannot attempt to persuade him to do so and * * * they may not continue to question him after he claims his rights. * * *" 19 Or App at 710.

Here, unlike *State v. Johnson,* 37 Or App 209, 586 P2d 811 (1978), there was no coercive attempt to cause defendant to change his mind. On the contrary, defendant considered his options and elected to proceed without counsel.

the Court in that case to adopt 'fully effective means * * * to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored * * *.' [Citations omitted.] The critical safeguard identified in the passage at issue is a person's 'right to cut off questioning.' [Citations omitted.] Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'

"A review of the circumstances leading to Mosley's confession reveals that his 'right to cut off questioning' was fully respected in this case. Before his initial interrogation, Mosley was carefully advised that he was under no obligation to answer any questions and could remain silent if he wished. He orally acknowledged that he understood the Miranda warnings and then signed a printed notification-of-rights form. When Mosley stated that he did not want to discuss the robberies, Detective Cowie immediately ceased the interrogation and did not try either to resume the questioning or in any way to persuade Mosley to reconsider his position. After an interval of more than two hours, Mosley was questioned by another police officer at another location about an unrelated holdup murder. He was given full and complete Miranda warnings at the outset of the second interrogation. He was thus reminded again that he could remain silent and could consult with a lawyer, and was carefully given a full and fair opportunity to exercise these options. The subsequent questioning did not undercut Mosley's previous decision not to answer Detective Cowie's inquiries. * * *

"This is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the

interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." 46 L Ed 2d, *supra* at 321-22.

Here, the interrogation of the defendant concerning the homicide commenced no sooner than four hours after questioning by the Washington officers had ceased. Before any questioning concerning the homicide began, his rights were again repeated to him and his initial confession was unquestionably voluntary. His statement during the taping of his prior confession that he did not know whether he wanted an attorney was not a request for an attorney and did not require the cessation of questioning. There was nothing about the circumstances of the questioning or either of the confessions to justify the conclusion that they were involuntary.

■    Defendant's contention that ORS 163.095 violates his constitutional right to equal protection is the same as that raised in *State v. Reynolds,* 289 Or 533, 614 P2d 1158 (1980), and was decided adversely to defendant's claim.

Affirmed.