**COMMONWEALTH**
v.
**David J. DOUGHERTY**

**No. 80-362**

Superior Court Department
Trial Court of the
Commonwealth of Massachusetts

**September 10, 1980**

Counsel of Record
Christine McEvoy, Attorney General, Plaintiff
Diane Julia, Defendant

## FINDINGS, RULINGS AND ORDER

Findings, rulings and order on the Motions of the defendent to suppress identification and to suppress statements; I reserve the right to amplify in writing on these findings and rulings delivered from the bench but, of course, I will not change any of the findings.

I find that on November 29, 1979, an individual masked and wearing a hat walked into a small dairy food store and confronted a Mister William T. Maine. He came from the right toward the counter armed with a pistol. The store was well lit and although Mister Maine was in fear he faced this individual as the individual approached the counter and throughout the time that he was emptying the money from the cash register. Following the departure of this individual, the police arrived and Mister Maine described the individual as a tall, slim man approximately six feet wearing very dirty Levi's and a plaid scarf. He was described as having dirty blond hair and a mustache. On the following day the police showed Mister Maine seven photographs. Among them a photograph of the defendant, David J. Dougherty. The police said nothing to Mister Maine other than: "Look through these photos." Or: "We want you to look at some photos." I have reviewed the photos and I find that three out of the seven photos including the photo of Mister Maine are double shots; that one is a full face and a side face shot. The photos were all black and white. They all depict white males, all of them with fairly long hair and all of them generally consistent with the description Mister Maine had given the police. Mister Maine, after examining the photos picked out the photograph of Mister Dougherty and said: "I'm positive this is him." In examining the photos, Mister Maine had held his hands over them to obscure that portion of the face that was obscured by the hat and the mask during the course of the robbery. At some time following this incident, Mister Maine came to the District Attorney's Office in Cambridge where he was shown this same group of seven photos plus another group of photographs each one including a picture of Mister Dougherty. On this second occasion he identified from the second group of photos a second picture of Mister Dougherty. There was nothing suggestive about the second array of photos shown to Mister Maine on that date.

During the early morning hours of December 1, 1979 following the initial identification of Mister Dougherty by Mister Maine, the police went to the Post Road Motel to arrest Mister Dougherty. The arrest was carried out by Officer Arthur C. Broder, a Police Officer who knew Mister Dougherty

and had spoken with him previously at least ten times. When the police knocked on the door of number 11 at the Post Road Motel a voice from inside, Mister Dougherty's voice, said: "Who is it?" Mister Broder answered that he was the manager and Mister Dougherty said: "No, that's you Arthur Broder. I know your name." The police then went into the Motel, Mister Dougherty offering no resistance, informed him that he was under arrest and Mister Broder gave Mister Dougherty his Miranda Rights from memory not from a police card. At this time, Mister Dougherty was dressed in Levi's and a plaid shirt. He appeared sober and walked unaided out to the police cruiser. During the ride to the Police Station he carried on a social conversation with another police officer. He then left the police cruiser unaided, walked normally into the Police Station, went through the Booking Room and up to Officer Broder's Office. He walked normally, appeared to be sober and made no remarks about his physical condition. At approximately 1:32 a.m. he was read his rights from a Miranda Rights Form. Having been read the Rights, Mister Broder said to Mister Dougherty: "Don't sign this form unless you understand it." Mister Dougherty said that he did understand it and signed the form. Interrogation then commenced. Mister Dougherty at first denied involvement in the armed robbery of the dairy food store and was then asked about his participation at various house breaks at two locations. These he denied as well. Officer Broder explained the strength of the police case with respect to the breaking and entering charges. I find that this aspect of the interrogation was not overbearing, the Police engaged in no deception. The Police accurately described the information that they had to Mister Dougherty. At this time Mister Dougherty admitted to the two house breaks and then admitted to the robbery of Mister Maine. He did, however, state that he was unarmed at the time. He appeared to the Officer throughout this period to be sober and not under the influence of narcotic drugs. He responded quickly to questions, spoke in normal tones, signed the Miranda Rights Form in a normal manner. His eyes appeared normal. He did not at any time fall asleep nor did his attention drift away. He appeared throughout in a good physical condition. During the course of the interrogation he was given a soft drink. Officer Broder, who for eight years was assigned to the Narcotics Unit of the local Police, is familiar with narcotics withdrawal symptoms and Mister Dougherty did not evidence any such symptoms. Mister Dougherty did say that he used the money obtained in the robbery to support his drug habit. He did ask whether he might be sentenced to a drug treatment house. And Officer Broder stated that the Police would not oppose any such sentence. Following the interrogation, Mister Dougherty was booked, answered the booking questions in a logical and intelligible fashion.

At 9:50 p.m., December 14, 1979, Mister Dougherty was again interrogated by the Police after having been again apprised of his Miranda Rights read to him from a Miranda Rights Form and having signed such Form evidencing he understood such Rights. The thrust of the interrogation during this evening centered on allegations that Mister Dougherty had uttered certain forged checks. During the course of this interrogation Officer Broder stated that the Police were interested in obtaining the gun used in the robbery and at this time, Mister Dougherty, for the first time admitted possession of the weapon at the time of the robbery and stated that it was old and broken and that he had disposed of the pistol. The pistol was never

recovered. Interrogation on the evening of the fourteenth lasted for one and one half hours. Again during this interrogation Mister Dougherty responded normally to questions, appeared normal at all times and did not appear under the influence of drugs or narcotics. I further find that during the interrogation on December first Officer Broder, among other things, said to Mister Dougherty, the following statements: "Did you do it? If you admit it you're owning up to what you did wrong. If it makes the case easier on us, we're not apt to go against the disposition. We would go along with out of State drug treatment." I find, however, that Officer Broder never suggested any quid pro quo for such conduct on the part of the police. Further on December 14th, Officer Broder stated: "We're looking for the gun to get it off the streets." It was after this statement that Mister Dougherty admitted possession of a weapon during the course of the robbery.

I rule with respect to the identification that the original array of photos shown to Mister Dougherty was not suggestive in any way and that Mister Maine's identification of Mister Dougherty is not impeachable on that score. Further, I rule that under the totality of the circumstances considering Mister Maine's opportunity to view the individual inside the well-lighted dairy food store, his attentiveness toward the individual compelled by the circumstances, the general accuracy of his description delivered to the Police immediately following the incident and the consistent positive identification of Mister Dougherty as the robber all add up to the conclusion that his identification is, in fact, reliable in light of the standards announced in **Manson V. Brathwaite**, 432 U.S. 98 114 (1977). **Commonwealth V. Worlds**, Mass Appeals Court Advance Sheets (1980) 229, 233 through 239.

Accordingly the Motion to Suppress Identification testimony is denied in its entirety.

With respect to the Motion to Suppress Statements, the defendant argues that his original denial of the robbery is equivalent to an indication that he refused to answer any questions and argues that interrogation should thereupon have ceased. See **Michigan V. Mosley**, 423 U.S. 96(1975) and **Commonwealth V. Brant**, Massachusetts Advance Sheets (1980), I disagree. The thrust of these cases is that interrogation must cease once the defendant gives any indication that he does not want to be further interrogated. In this case, Mister Dougherty made no objection to his interrogation and the Police were not bound to accept his earlier denial. The defendant makes mention of the **Rhode Island V. Innis** 48 U.S.L.W. 4506 (May 12, 1980) with respect to the statements on the fourteenth concerning the interest of the Police in obtaining the handgun. That case, however, is inapposite because while I admit that interrogation was going on that time, it was interrogation following the reading of Miranda Rights, the defendant having made no indication that he wished interrogation to cease. Further I find that while the defendant might well have been a drug dependent person on both December 1 and December 14, he was not then under the influence of drugs or drug withdrawal and that the Commonwealth has met its heavy burden of establishing the voluntariness of the inculpatory statements made on both occasions. I rule that the defendant made a knowing, intelligent and voluntary waiver of his right to remain silent and his Motion to Suppress Statements is likewise denied.

**William G. Young**
**Justice of the Superior Court**