OPINION
{¶ 1} On May 29, 2002, the Stark County Grand Jury indicted appellant, Anthony Loyer, on one count of aggravated murder with prior calculation and design and a firearm specification in violation of R.C.2903.01. Said charges arose from the shooting death of appellant's father, Steven Loyer.
 {¶ 2} On October 17, 2002, appellant filed a motion to suppress his statements made to police officers. A hearing was held prior to trial on October 22, 2002. The trial court suppressed any statements made after appellant invoked his right to counsel; all other statements were admissible.
 {¶ 3} After trial, the jury found appellant guilty as charged. By judgment entry filed November 1, 2001, the trial court sentenced appellant to life in prison with parole eligibility after twenty years, and three years on the firearm specification, to be served consecutively.
 {¶ 4} Appellant filed an appeal and this matter is now before this court for consideration. Assignments of error are as follows:
 I {¶ 5} "THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED PLAIN ERROR BY PERMITTING THE INTRODUCTION OF APPELLANT'S CONFESSIONS WHICH WERE OBTAINED IN VIOLATION OF APPELLANT'S CONSTITUTIONAL PRIVILEGE AGAINST SELF-INCRIMINATION AND WHICH WERE NOT FREELY AND VOLUNTARILY GIVEN."
 II {¶ 6} "THE VERDICT IS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE AND CONTRARY TO LAW."
 III {¶ 7} "THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED APPELLANT'S DUE PROCESS RIGHT TO A FAIR TRIAL BY PERMITTING THE STATE TO INTRODUCE HEARSAY STATEMENTS WHICH DID NOT POSSESS A PARTICULARIZED GUARANTEE OF TRUSTWORTHINESS AND WHICH WERE WHOLLY UNRELIABLE."
 IV {¶ 8} "THE CUMULATIVE EFFECT OF ERRORS DURING THE TRIAL RESULTED IN APPELLANT BEING DENIED A FAIR TRIAL."
 I {¶ 9} Appellant claims the trial court erred in denying his motion to suppress. We disagree.
 {¶ 10} There are three methods of challenging on appeal a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. State v. Fanning
(1982), 1 Ohio St.3d 19; State v. Klein (1991), 73 Ohio App.3d 485; Statev. Guysinger (1993), 86 Ohio App.3d 592. Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. State v. Williams (1993),86 Ohio App.3d 37. Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. State v. Curry (1994), 95 Ohio App.3d 93; State v. Claytor
(1993), 85 Ohio App.3d 623; Guysinger. As the United States Supreme Court held in Ornelas v. U.S. (1996), 116 S.Ct. 1657, 1663, " as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal."
 {¶ 11} In Miranda v. Arizona (1966), 384 U.S. 436, the United States Supreme Court held a suspect must be notified of his/her constitutional rights to remain silent and to have counsel present during a custodial interrogation by the police. Before the interrogation can begin, the suspect must make a knowing, intelligent, and voluntary waiver of those rights. If these procedural safeguards are not complied with, the confession may not be admitted at trial as evidence against the accused. According to Miranda at 444:
 {¶ 12} "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."
 {¶ 13} In addition, a suspect's decision to waive his rights "is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." State v. Dailey (1990), 53 Ohio St.3d 88, paragraph two of the syllabus, following Colorado v. Spring (1987),479 U.S. 564. In determining voluntariness, we must look at the totality of the circumstances as set forth by the Supreme Court of Ohio in Statev. Edwards (1976), 49 Ohio St.2d 31, paragraph two of the syllabus:
 {¶ 14} "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including, the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."
 {¶ 15} Appellant argues his statements to police should have been suppressed because his five minutes of silence after having been advised of his Miranda rights for the third time should have been deemed a refusal. Appellant argues with his tacit refusal, the officers should not have engaged in any further conversation with him. In support, appellant cites the case of Michigan v. Mosley (1975), 423 U.S. 96, 103-104, wherein the United States Supreme Court held the following:
 {¶ 16} "A reasonable and faithful interpretation of the Miranda
opinion must rest on the intention of the Court in that case to adopt `fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored. . . .' 384 U.S., at 479, 86 S.Ct., at 1630. The critical safeguard identified in the passage at issue is a person's `right to cut off questioning.' Id., at 474, 86 S.Ct., at 1627. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his `right to cut off questioning' was `scrupulously honored.'"
 {¶ 17} We find the facts sub judice do not support appellant's contention. According to Mosley, officers may resume questioning if they scrupulously follow Miranda. We concur with the trial court's analysis that appellant's five minutes of silence was not a refusal, and therefore there were no Miranda violations even in light of Mosley, for the following reasons.
 {¶ 18} At the outset, we note appellant's time in the booking room was videotaped and the trial court indicated it had reviewed the tape. Vol. I T. at 47. In examining this videotape, the trial court determined there was neither a refusal by appellant nor an invocation of his constitutional rights prior to transport. Id. at 54-55. Clearly, it is within a trial court's province to make a call on the facts presented into evidence. A trial court's decision on factual issues will not be disturbed by an appellate court unless the record as a whole does not support the trial court's conclusion.
 {¶ 19} During his arrest, appellant was verbally advised of his constitutional rights by Alliance Police Department Sergeant Jeffrey Carper. Id. at 7. Appellant acknowledged he understood these rights. Id. at 7-8. Patrolman David McElhaney overheard appellant receive his rights from Sergeant Carper, and then transported him to the Alliance Police Department. Id. at 13-14. During the transport, Patrolman McElhaney verbally reminded appellant of his right to remain silent and suggested "that he do that until detectives talked to him back at the police station." Id. at 14. Patrolman McElhaney took appellant to the booking room and read him his Miranda rights off of a form. Id. at 15. Appellant acknowledged understanding the rights and signed a waiver of those rights. Id. at 15-16. No interviewing was done at this time. Id. at 16, 20. Detective Edward Wonner and Detective Mucklo took appellant from the booking area into the detective bureau to interview him. Id. at 23. Again, appellant was read his Miranda rights from a form, but when asked if he understood the rights, he stated "he did not understand this." Id. at 23-24. The detectives explained the rights. Thereafter, appellant "just sat there quietly." Id. at 24. He did not say he did not understand or he did not want to speak to the detectives. Id. He did not request a lawyer. Id. Detective Wonnor assumed the silence was a refusal. Id. at 25. After sitting there a few minutes, appellant "made mention in that he want — he would talk to us." Id. No statements or questions had been made by the detectives. Id. The detectives then re-read appellant his constitutional rights "section by section." Id. at 26-27. Appellant signed the form acknowledging his understanding and then made statements to the police. Id. at 28.
 {¶ 20} As stated in State v. Nelson (September 22, 1994), Ross App. No. 1984, a valid waiver of constitutional rights should be reviewed given the entire circumstances surrounding the waiver:
 {¶ 21} "The analysis of a waiver's validity has two distinct aspects. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice, rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right abandoned and the consequences of the decision to abandon it."
 {¶ 22} Prior to appellant's few minutes of silence with the detectives, he was informed of his constitutional rights three times and acknowledged his understanding of them. In fact, he was cautioned to remain silent until his interview with the detectives. When the interview finally happened and appellant was readvised of his rights, the issue of waiving and speaking was imminent. Appellant's silence at that time was understandable. However, such silence was not a refusal. Further, the detectives were not hostile, coercive or threatening. Once appellant stated his desire to speak, he was carefully read his rights again. Thereafter, appellant acknowledged his understanding of the rights, waived his rights and spoke.
 {¶ 23} Upon review, we find the officers scrupulously followedMiranda and did so by carefully reading "section by section" appellant's constitutional rights for the fifth time. The trial court did not err in denying appellant's motion to suppress.
 {¶ 24} Assignment of Error I is denied.
 II {¶ 25} Appellant claims his conviction was against the manifest weight of the evidence. We disagree.
 {¶ 26} On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. State v. Jenks (1991), 61 Ohio St.3d 259. On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Martin (1983), 20 Ohio App.3d 172, 175. See also, State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin at 175.
 {¶ 27} Appellant was convicted of aggravated murder in violation of R.C. 2903.01(A) which states "[n]o person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy."
 {¶ 28} There is no dispute that appellant's father, Steven Loyer, was shot in the back of the head and killed while in his residence. Vol. I T. at 199-200, 211; Vol. II T. at 143, 161. Because of a report by Doug Horning, appellant's friend who was in the residence at the time of the incident helping appellant move some items, appellant became a suspect and was transported to the Alliance Police Department. Vol. II T. at 8-9. Appellant confessed to shooting his father "in the back of the head with a .22 caliber rifle." Id. at 10. Appellant admitted to an argument with his father earlier that evening. Id. Appellant returned to his father's residence to move some of his belongings, and "asked his dad what was up on the bookshelf and as his dad turned to look he pointed the weapon at him and fired it and shot him." Id. at 10-11. The firearm was taken from the dining room table of the residence. Id. at 11. The coroner established there was a gunshot wound to the back of Steven Loyer's head, which along with two stab wounds, caused his death. Id. at 144-152, 155-158, 161.
 {¶ 29} Mr. Horning testified appellant told him about a heated argument appellant had had with his father on the day in question. Id. at 76-77. At the time of the incident, Mr. Horning was upstairs alone when he heard a gunshot. Id. at 81-82. Thereafter, appellant "came up to the top of the steps" and asked Mr. Horning "if I'd give him a hand with something downstairs." Id. at 83. Appellant was holding a rifle. Id. When Mr. Horning accompanied appellant downstairs, he observed Steven Loyer's body "laying in the dining room doorway." Id. at 84. Mr. Horning asked appellant "how he could have done that" and appellant stated "he had his father walk in and he asked his dad to look at what was on the shelf and when his dad looked up he said he shot him in the back of the head." Id. at 87. Mr. Horning testified he had heard appellant make statements about his desire to kill his father, but he never took them seriously. Id. at 105-106.
 {¶ 30} Angela Cline, Mr. Horning's ex-wife, also heard appellant make threats against his father, but she did not consider them to be serious. Id. at 230.
 {¶ 31} From our review of the evidence, we find it is clear that appellant shot his father given his own admissions to the police and Mr. Horning. There is also credible evidence the act was done with prior calculation and design as he lured his father into turning and looking up at the bookshelf before he shot him in the head. We find no manifest miscarriage of justice.
 {¶ 32} Assignment of Error II is denied.
 III {¶ 33} Appellant claims the trial court erred in permitting the testimony of Mr. Horning and Ms. Cline regarding his statements about his desire to kill his father. We disagree.
 {¶ 34} Both witnesses testified they heard appellant's threats against his father, but never took them seriously. Id. at 105-106, 230. Appellant now argues Mr. Horning, who was initially identified as a possible suspect, was an untrustworthy witness and should not have been permitted to testify as to appellant's admissions. Appellant also argues these prior statements were the basis of the prior calculation and design evidence and therefore should not have been permitted.
 {¶ 35} The admission or exclusion of evidence lies in the trial court's sound discretion. State v. Sage (1987), 31 Ohio St.3d 173. In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore (1983),5 Ohio St.3d 217.
 {¶ 36} A statement of a defendant against interest is an exception to the hearsay rule:
 {¶ 37} "A statement that was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." Evid.R. 804(B)(3).
 {¶ 38} The statements sub judice were clearly against appellant's pecuniary or proprietary interest. The fact that Ms. Cline also heard the statements negates against the questioned credibility of Mr. Horning. Further, appellant had told the police Mr. Horning had nothing to do with the murder of his father. Vol. II T. at 12.
 {¶ 39} Based upon the corroboration of Ms. Cline and appellant's statement regarding Mr. Horning's culpability, we find no abuse of discretion. The testimony qualifies as a hearsay exception under Evid.R. 804(B)(3).
 {¶ 40} Assignment of Error III is denied.
 IV {¶ 41} Appellant claims his conviction should be reversed based on cumulative errors. Having found no error in the assignments oferror supra, this assignment of error is denied.
 {¶ 42} Assignment of Error IV is denied.
 {¶ 43} The judgment of the Court of Common Pleas of Stark County, Ohio is hereby affirmed.
By Farmer, P.J., Hoffman, J. and Wise, J. concur.