ERDMANN, Judge
(dissenting):
I respectfully disagree with the majority’s conclusion that Delarosa ambiguously asserted his right to remain silent. I further conclude that, under the circumstances of this case, Delarosa’s assertion of his right to remain silent was not scrupulously honored. Therefore, I dissent.
The initial difference between my position and the majority’s centers on whether Dela-rosa unambiguously invoked his right to remain silent. I agree with the United States Navy-Marine Corps Court of Criminal Appeals’ conclusion on this question: “[OJnce [Delarosa] made clear that his willingness to make a statement was contingent on having a command representative present, the ambiguity was resolved.” United States v. Delarosa, No. NMCCA 200602335, 2008 CCA LEXIS 4, at *12, 2008 WL 142115, at *4 (N.M.Ct.Crim.App. Jan. 10, 2008) (unpublished). This conclusion of law reflects appropriate consideration of the findings of fact, which are not clearly erroneous, and is rationally derived from all the circumstances. There is no reason to depart from that conclusion and find ambiguity where none exists.
Delarosa’s written response as to whether he would waive his rights and make a statement was clear enough on its face.[1] However, granting that Delarosa’s prior conduct may have indicated a willingness to talk and perhaps created some uncertainty about the meaning of his invocation, the detectives immediately clarified any apparent confusion. Upon determining that Delarosa would not waive his right to remain silent unless a command representative was present, and since police policy would not allow that presence, the detectives had the necessary clarification and Delarosa’s invocation was unambiguous.
Once the uncertainty about Delarosa’s apparent change of heart was resolved, any law enforcement actions designed or reasonably likely to overcome Delarosa’s resolve to remain silent were impermissible: “If the indi *327 vidual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege.” Miranda v. Arizona, 384 U.S. 436, 473-74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
If a reasonable police officer in the circumstances would understand that statement to be an invocation of the right to remain silent, then that invocation is not ambiguous. Burket v. Angelone, 208 F.3d 172, 200 (4th Cir.2000) (citing Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)). Here, the detectives themselves recognized that Delarosa invoked his right to remain silent. Detective Mayer testified that “[Delarosa] had put ‘No’ to question number 6, so we couldn’t talk to him.” Similarly, when Delarosa learned his wife was taking a polygraph exam and indicated he wished to make a statement, “Detective Mayer responded that since the accused wrote ‘NO’ on the rights waiver form they would have to re-advise him of his rights.” These statements reflect that Detective Mayer understood that Delarosa had unambiguously invoked his right to remain silent. Under these circumstances I agree with the police officer at the scene and the lower court that Delarosa unambiguously invoked his right to remain silent when he indicated he was unwilling to talk without a command representative present.
The invocation of the right to remain silent does not, however, impose a permanent bar against further questioning. Weeks v. Angelone, 176 F.3d 249, 267 (4th Cir.1999), and Vujosevic v. Rafferty, 844 F.2d 1023, 1028 (3d Cir.1988) (both citing Michigan v. Mosley, 423 U.S. 96, 102-03, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975)). The admissibility of any subsequent statements depends upon an analysis as to whether the law enforcement officials involved “scrupulously honored” the invocation of the right to remain silent. Mosley, 423 U.S. at 103-04, 96 S.Ct. 321. “[T]he touchstone is whether a ‘review of the circumstances’ leading up to the suspect’s confession reveals that his ‘right to cut off questioning was fully respected.’” Weeks, 176 F.3d at 268 (quoting Mosley, 423 U.S. at 104, 96 S.Ct. 321).
From the outset, the Norfolk police detectives seemed determined to get Delarosa to speak. They admittedly used a ruse to get Delarosa to the police station and “Detective Bynum admitted that he would have done anything he legally could have done to keep the accused at the [Police Operations Center], if he had asked to leave.” At no point did the detectives inform Delarosa that he was free to go. Rather, they expressed an intention to keep Delarosa at the police station and they succeeded in doing just that despite lacking probable cause to arrest De-larosa.
After Delarosa invoked his right to remain silent, the detectives did not cease their efforts to get Delarosa to talk. Detective By-num immediately asked Delarosa, “ ‘Why did you say “No”?’ ” Delarosa explained that he wanted a representative from his command present. As the detectives left the interrogation room, Bynum told Delarosa to “consider” his decision, which under the circumstances could only mean to “reconsider,” and to knock on the door when he decided what he wanted to do. The door in question was the exit to a small, spartan interrogation room where Delarosa sat isolated. A reasonable man, having been informed of his custodial interrogation rights and then told to knock on the only available exit after reconsidering his previous election to remain silent would conclude he was not free to leave unless he changed his mind.
Nonetheless, the detectives did not wait for Delarosa to make up his own mind. After about thirty-five minutes Detective Mayer opened the door and asked if Delarosa was willing to take a polygraph exam. Although such a question in and of itself may not be an interrogation, see Rhode Island v. Innis, 446 U.S. 291, 308, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (Stevens, J., dissenting), the question imparts a desire to have the suspect talk about the matter under investigation. Having kept Delarosa isolated after he invoked his right to remain silent and with no change in circumstance, Norfolk detec *328 tives directly asked Delarosa to make a statement via a polygraph exam without any reference to his rights or his prior invocation of the right to remain silent. While this tactic certainly did not scrupulously honor Delarosa’s invocation of the right to remain silent, it was effective. Delarosa abandoned his resolve to remain silent and agreed to take a polygraph exam, but was again left alone in the interrogation room while the detectives picked up his wife for questioning.
For approximately the next two hours, De-larosa remained isolated in the interrogation room. Detective Mayer then asked if Dela-rosa needed anything and Delarosa indicated he wished to use the bathroom. Mayer escorted Delarosa to the bathroom and remained outside while Delarosa was in the bathroom. After he exited the bathroom, Delarosa asked to use the telephone and Mayer responded that it would be a while because Mayer was busy. When Delarosa asked what was going on, Mayer responded that Delarosa’s wife was in an interview room preparing for a polygraph exam and that Delarosa could use the phone after the polygraph exam was complete. Delarosa expressed some surprise that his wife was at the police station and asked to talk to with her. He was told that he could not see her until after her polygraph exam. At this point Delarosa, who had already abandoned his resolve to remain silent when he agreed to a polygraph exam, again indicated that he wanted to talk to the detectives. Mayer responded that he would have to re-advise Delarosa of his rights.
The circumstances of Delarosa’s case stand in contrast to those of Mosley and United States v. Watkins, 34 M.J. 344 (C.M.A.1992), where officers were found to have honored a suspect’s invocation of rights. In Mosley the Supreme Court found it significant that: (1) after Mosley invoked his right to remain silent, officers ceased questioning right away; (2) a significant period of time elapsed before questioning resumed; (3) the officers informed Mosley of his rights a second time; and (4) the later questioning was about a distinctly different offense. 423 U.S. at 106-07, 96 S.Ct. 321. In Watkins this court found the following factors significant with respect to whether Watkins’ invocation of the right to remain silent had been honored: (1) agents gathered additional evidence and sought to interview Watkins two and one-half hours after he initially invoked his right to remain silent; (2) Watkins was reminded of the earlier rights warning; (3) the second interview was at Watkins’ quarters and not in the “coercive environment arising from being in custody at the police station”; and (4) after Watkins requested counsel the interview stopped, but Watkins himself initiated further conversation. 34 M.J. at 347.
Contrast Mosley and Watkins with the manner in which the Norfolk police treated Delarosa’s invocation of the right to remain silent. When Delarosa invoked his right, he was first questioned as to why he was invoking it. Once it was clarified that he was invoking his right to remain silent, he was told to “consider what he would like to do.” Delarosa was kept in an eight-by-twelve-foot interrogation room at the police station despite the absence of probable cause to arrest him and was told to knock on the door only after he had considered his decision to remain silent. Thirty-five minutes later the same officers in the same location once again approached Delarosa and asked if he would take a polygraph exam with no mention of his rights or his prior invocation of the right to remain silent. Although Delarosa agreed to take a polygraph exam at that time, he was left in isolation for another two hours. After discovering that the police were preparing to administer a polygraph exam to his wife, Delarosa once again abandoned his resolve and informed the detectives that he wanted to waive his rights and talk with them.
These circumstances eroded any resolve Delarosa had to remain silent and that erosion was the product of the conduct of the Norfolk detectives. I therefore conclude that Delarosa unambiguously invoked his constitutional right to remain silent and that the Norfolk detectives did not scrupulously honor that invocation. Delarosa’s ultimate waiver of the right to remain silent and his written confession were not the product of a free and voluntary election. I would reverse *329 the decision of the United States Navy-Marine Corps Court of Criminal Appeals, set aside the findings and sentence, and authorize a rehearing.

. It could be reasonably argued that Delarosa clearly and unambiguously asserted his right to remain silent when, after being advised of his rights and indicating an understanding of them, Delarosa wrote "NO” in response to a written question asking whether he wished to waive his rights and malte a statement. See United States v, Rambo, 365 F.3d 906, 910 (10th Cir.2004) ("There is no nuance nor context to vary the unequivocal meaning of Rambo's single word, monosyllabic response. His response, 'No,' could only mean an invocation of the right to remain silent.”). The clarity of this invocation is enhanced by the fact that Delarosa wrote "N/A” in the next blank on the rights warning form which called for an affirmation of the voluntariness of any statement. After a rights warning, an informed decision to remain silent arguably vitiates any previous, uninformed reflections of willingness to talk, and even asking the suspect "why” could be viewed as a failure to scrupulously honor that informed invocation of the right to remain silent. But see Medina v. Singletary, 59 F.3d 1095, 1105 (11th Cir.1995).