Filed 9/30/13  P. v. Duarte CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>            Plaintiff and Respondent,<br><br>v.<br><br>KEVIN DUARTE,<br><br>            Defendant and Appellant. | A134634<br><br>(Alameda County<br>Super. Ct. No. C159175) |

A jury convicted Kevin Duarte of first degree murder (Pen. Code, §§ 187, subd. (a), 189)[1] during the commission of an attempted robbery (§ 190.2, subd. (a)(17)(A)), among other offenses. The court sentenced defendant to life in prison without the possibility of parole. (§ 190.2, subd. (a)(17)(A).) Defendant appeals. He contends his confession was obtained by the police without proper advisement of his right to remain silent and should have been suppressed. (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).) In the discussion that follows, we conclude the confession was properly admitted. We shall affirm the judgment.

**Facts**

Tony Simon was shot and killed at an Oakland gas station shortly after midnight on September 4, 2007. The police viewed a surveillance videotape of the incident. The videotape shows Simon driving into the gas station, where he speaks with a man standing at the passenger window. Two men then approach the driver's window. The police

---

[1] All further section references are to the Penal Code.

1

recognized one of the men as Roland Davis but did not recognize the other man. The two men exchanged words with Simon after which Simon speeds out of the gas station. As Simon drives away, the unidentified man raises a handgun and fires multiple shots at him. Simon suffered gunshot wounds to his back and died at the scene.

The police interviewed Davis, who identified defendant as the shooter. The police then interviewed defendant, who admitted shooting Simon while trying to rob him. In a recorded statement, defendant said: "I walked over to him. I reached in the car, and I tried to rob him. I told him man 'Give it up.' And he tried to grab me like[,] like grab the gun[,] like fight me[,] like pull on me . . . Like pull off with me in the car. And the gun went off. I kept shootin' . . . ."

### Pretrial Proceedings

The prosecution filed an in limine motion seeking admission of defendant's confession. The defense opposed the motion, claiming defendant was not properly advised of his right to remain silent. (*Miranda, supra,* 384 U.S. 436.) The court held an evidentiary hearing to decide the matter.

At the hearing, Oakland Police Sergeant Tony Jones testified that defendant was arrested for an unrelated burglary on September 18, 2007. Officers investigating the burglary advised defendant of his *Miranda* rights and defendant elected to remain silent. The exchange between the investigators and defendant lasted less than 10 minutes and is documented by an Oakland Police Department statement form. The one-page form contains case information, a *Miranda* admonition, a waiver section and blank lines to write a statement.[2] The waiver section contains two questions with spaces for the suspect's responses and initials. The first question asks "Do you understand each of these rights I have explained to you?" The burglary investigator wrote defendant's response as "yeah." The second question asks "Having these rights in mind, do you wish to talk to us

---

[2] The admonition reads as follows: "You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford a lawyer, one will be appointed to represent you before any questioning if you wish one."

now?" Defendant's response is listed as "No I don't want to give a statement." Defendant's initials appear next to each response. The investigators concluded the interview at 7:42 a.m., booked defendant for burglary, and placed him in jail.

Later that day, Sergeant Jones, who was investigating the Simon homicide, learned that defendant was in custody. Jones read defendant's statement form in the burglary case "to see exactly what it was he said to the investigators." Jones arrested defendant for murder and had him transported from jail to the homicide division. Defendant was placed in an interview room at 9:00 p.m., as documented by an interview log posted on the room's door to record movements in and out of the room. Defendant was given a meal and, at 10:45 p.m., Jones and another officer entered the room to interview defendant.

The room was not equipped with a video or audio system. Jones testified: "At the time, the practice of the police department was we would interview subjects, witnesses and suspects; we would talk to him; take handwritten notes and ask them to provide a written statement, once we were done talking about whatever we were talking about; and the person would have the option to be okay with [an audio recording], or to decline. And if they said okay, we would take the recorded statement from them."

Jones testified that, "prior to interviewing the defendant," he read the *Miranda* rights "verbatim" from the police statement form. Jones asked defendant if he understood his rights and defendant said "yes." Jones asked defendant: "Having those rights in mind, would you like to talk to us now?" Defendant said "yes." Jones wrote defendant's responses on the form and wrote Xs on the form for defendant to place his initials in acknowledgement of his waiver of rights. Jones testified: "immediately after the two responses, I had him place his initials on the form." Jones "sat right there and watched" defendant write his initials on the form, the officer said. The initials "RD" (for Rafael Duarte) appear on the form. Jones's handwritten notes of the interview report: "2252 [10:52 p.m.] Admonished/Yes/Yes." The other officer's notes are almost identical: "2252 Admonished 'Yes' 'Yes.'"

Jones testified that nothing suggested defendant did not understand his rights. Jones said defendant started talking immediately after being *Mirandized* and no threats or

3

promises were made by the police during the interview. The officers' notes show the interview started with a denial; defendant said "I didn't do anything." Jones told defendant that Davis identified him as the shooter and showed defendant the gas station videotape. Police notes show that defendant asked "How do you know Roland [Davis is] not full of shit?" The notes also report that defendant said "you can't see my face in the video" and "man, I think I can beat this. I know that video's not admissible in court." After a long interrogation, defendant reportedly said "Okay man. I'm going to keep it real. I didn't mean to shoot him. I got nervous and he pulled off. [¶] We was going to strip him. We weren't going to shoot him." After defendant admitted the crime, an audiotape statement was taken at 2:33 a.m., almost four hours after the interview began. The audiotape statement is 13 minutes long.

A transcription of the recording begins with a discussion of defendant's waiver of rights. "Q. . . . I guess you came to the police department sometime early, early in the mornin[g]? Something unrelated to this? We're not going to get into that – is that right? [¶] A. Yes. [¶] Q. At that time, some detectives talked to you? [¶] A. Mm hm. [¶] Q. I mean, did they? [¶] A. Yeah. [¶] Q. Okay. They read you your rights? [¶] A. Yeah. [¶] Q. Okay. I read you your rights -- [¶] A. Yeah. [¶] Q. – when we came in here, too, off this white piece of paper? [¶] A. Yes. [¶] Q. Um . . . I asked you if you knew what they were . . . before I read [th]em to you? [¶] A. Yes. [¶] Q. Okay. And, I, uh, told you 'You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford a lawyer, one will be appointed to represent you before any questioning if you wish one.' Is that correct?" [¶] A. Yes. [¶] Q. Okay. And, . . . – I asked you 'Do you understand each of these rights I explained to you?' You said, 'Yes,' is that correct? [¶] A. Yes. [¶] Q. And I asked you, 'Having these rights in mind, do you wish to talk to us now?' You said 'Yes,' is that correct? [¶] Yes. [¶] Q. Those are your initials right there on those two lines? [¶] A. Yes."

Defendant admitted on the audiotape that he shot Simon: "[W]e planned on robbin' 'em, and everything went bad. Cuz when I tried to rob him, he grabbed the gun

4

and I got nervous. I got scared and I accidentally shot the gun off. . . . I didn't mean to kill him."

At the pretrial hearing, defendant recanted his confession and denied waiving his *Miranda* rights. Defendant testified that Sergeant Jones never advised him of his *Miranda* rights before turning on the tape recorder. Defendant also denied placing his initials on the statement form waiving his rights. Defendant said Jones coerced him into confessing by threatening him with the death penalty and promising him a voluntary manslaughter deal. Jones told defendant to "play along" with everything the officer said during the recorded portion of the interview to obtain the deal. Defendant agreed. Defendant therefore said on tape that he had been read his *Miranda* rights and waived them when, in fact, he had not.

An expert in forensic document interpretation examined the initials on the waiver form and compared them with known writings of defendant. The expert found "significant differences" between the waiver form initials and known writings that led her to conclude it "highly probable" that defendant did not initial the waiver form. On cross examination, the expert conceded she could not "positively eliminate" defendant as the source of the initials and acknowledged the possibility that defendant intentionally distorted his writing so he could later deny initialing the form.

A second document expert opined that "it is highly probable that [defendant] did not write these questioned RD initials" on the waiver form but could not eliminate defendant as the author. The expert saw no similarity between the written initials and Jones's handwriting to suggest that the officer initialed the form.

The court ruled the confession admissible. The court noted that the question of whether Jones provided a *Miranda* admonishment at the start of the homicide interrogation was "a straight credibility question" that required the court to weigh the conflicting testimony of Sergeant Jones and defendant. The court said "I'll come down on the side of Sergeant Jones on that one." The court found expert testimony questioning the authenticity of defendant's initials on the waiver form to be largely irrelevant because, whether the form was initialed by defendant or someone else, defendant acknowledged

5

on the audio recording that he had been advised of his *Miranda* rights at the outset of the interview and waived his rights. The court found his recorded acknowledgement voluntary and rejected defendant's testimony that his acknowledgment was coerced by threats or promises.

## Trial Proceedings

The prosecution presented defendant's confession and other evidence as summarized above in the statement of facts. Defendant testified consistent with his pretrial testimony; he denied the shooting and said the police coerced his confession by threatening the death penalty and promising a reduced charge of voluntary manslaughter. The document experts testified, as they had at the pretrial hearing, that it was "highly probable" defendant did not write his initials on the *Miranda* waiver form.

The jury convicted defendant of first degree murder (§§ 187, subd. (a), 189) and found true allegations that the murder was committed during an attempted robbery (§ 190.2, subd. (a)(17)(A)) and that defendant personally and intentionally discharged a firearm resulting in Simon's death (§ 12022.53, subd. (d)). The jury also convicted defendant of shooting at an occupied motor vehicle (§ 246) committed with personal use of a firearm (§ 12022.53, subd. (b)).

The court sentenced defendant to prison for life without the possibility of parole on the murder conviction (§ 190.2, subd. (a)(17)(A)) enhanced by 25 years to life for firearm use resulting in death (§ 12022.53, subd. (d)). The conviction for shooting at an occupied vehicle and related gun enhancement were stayed. (§ 654.) Defendant filed a timely appeal.

## Discussion

Defendant raises a single claim on appeal. He contends his confession was obtained by the police without proper advisement of his right to remain silent and should have been suppressed.

"No person . . . shall be compelled in any criminal case to be a witness against himself." (U.S. Const., 5th Amend.) To protect a suspect's constitutional right against self-incrimination, law enforcement officers conducting custodial interrogation must

6

advise the suspect that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Miranda*, *supra*, 384 U.S. at p. 479.) "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him." (*Id.* at pp. 444-445.)

Once a suspect invokes his or her right to remain silent, law enforcement officers must "scrupulously honor" the invocation and end the interrogation. (*Miranda, supra,* 384 U.S. at p. 479.) However, unlike an invocation of the right to counsel (*Edwards v. Arizona* (1981) 451 U.S. 477, 484-485), a suspect's invocation of the right to silence does not create "a *per se* proscription of indefinite duration upon any further questioning by [the] police." (*Michigan v. Mosley* (1975) 423 U.S. 96, 102-103 (*Mosley*).) When a suspect asserts his or her right to remain silent, the police must stop the interrogation but may conduct a second interrogation concerning a separate crime following "the passage of a significant period of time and the provision of a fresh set of warnings." (*Id.* at p. 106.)

In *Mosley, supra,* 423 U.S. at page 97, the defendant was arrested for robberies and, after being advised on his *Miranda* rights, declined to discuss the robberies. The robbery detective ended the interrogation and placed defendant in a jail cell. (*Ibid.*) More than two hours later, a homicide detective transferred defendant from the jail cell to the homicide division, read *Miranda* warnings, and questioned the defendant about a fatal shooting during a separate robbery not mentioned in the first interrogation. (*Id.* at pp. 98, 104.) Defendant made a statement implicating himself in the homicide and, later, moved to suppress the statement. (*Id.* at pp. 98-99.) The trial court denied the motion to suppress and defendant was convicted of murder. (*Id.* at p. 99.)

7

The United States Supreme Court held that admission of the incriminating statement did not violate the principles of *Miranda*. (*Mosley, supra,* 423 U.S. at p. 107.) The court found the defendant's "'right to cut off questioning' was fully respected" when the detective stopped questioning him about the robberies. (*Id.* at p. 104.) The defendant's invocation of the right to remain silent was not violated by later questioning by another detective at another location about an unrelated crime. (*Id.* at pp. 104-105.) The defendant "was given full and complete *Miranda* warnings at the outset of the second interrogation. He was thus reminded again that he could remain silent and could consult with a lawyer, and was carefully given a full and fair opportunity to exercise these options. The subsequent questioning did not undercut [the defendant's] previous decision not to answer [the robbery detective's] inquiries." (*Ibid.*)

*Mosley* applies here. Officers investigating a burglary advised defendant of his *Miranda* rights and defendant said "I don't want to give a statement." The investigators immediately ended the interview, booked defendant for burglary, and placed him in jail. Thirteen hours later, defendant was transported from jail to the homicide division for questioning by another investigator in the unrelated Simon shooting. Sergeant Jones testified that defendant was advised of his *Miranda* rights at the outset of this second interrogation and voluntarily waived his right to remain silent. Defendant disputed this testimony but, in reviewing a claim under *Miranda,* " '[w]e must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported.' " (*People v. Bradford* (1997) 14 Cal.4th 1005, 1033.)

The trial court's resolution of disputed facts and its evaluations of credibility are substantially supported by the testimony presented at the evidentiary hearing, two sets of handwritten notes of the interview, and defendant's recorded confession, whatever weight may be accorded the initialed waiver form. The recorded confession includes defendant's acknowledgment that he received a *Miranda* advisement at the outset of the interrogation and waived his right to remain silent. "Q. Okay. I read you your rights . . . when we came in here, . . . off this white piece of paper? [¶] A. Yes. [¶] Q. . . . I asked you if you knew what they were . . . before I read [th]em to you? [¶] A. Yes. [¶] Q. Okay. And, I . . . told

8

you 'You have the right to remain silent. . . .' Is that correct? [¶] A. Yes. [¶] Q. . . . I asked you 'Do you understand each of these rights I explained to you?' You said, 'Yes,' is that correct? [¶] A. Yes. [¶] Q. And I asked you, 'Having these rights in mind, do you wish to talk to us now?' You said 'Yes,' is that correct? [¶] Yes. [¶] Q. Those are your initials right there on those two lines? [¶] A. Yes." Substantial evidence supports the trial court's determination that this acknowledgment was voluntary and not coerced by threats or promises as defendant claimed.

## Disposition

The judgment is affirmed.


_____
Pollak, J.


We concur:


_____
McGuiness, P.J.


_____
Jenkins, J.