# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | I.D. No. 1905002655 |
| | ) | |
| ROBERTO RODRIGUEZ, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Submitted: July 21, 2021
Decided: August 25, 2021

*On Defendant's Motion for Suppression of Evidence.*
**DENIED.**

## MEMORANDUM OPINION

Diana A. Dunn, Esquire, DEPARTMENT OF JUSTICE, Wilmington, Delaware. *Attorney for the State of Delaware.*

John P. Deckers, Esquire, Wilmington, Delaware. *Attorney for Roberto Rodriguez.*

**BUTLER, R.J.**

# BACKGROUND

At approximately 1:15 a.m. on the morning of May 4, 2019, a female University of Delaware student was walking on Chapel Street in Newark. A surveillance camera located at Chapel and Main Streets recorded her entering a GMC Sierra truck with a black toolbox behind the cab, a cooler in the back, black well guards over the rear wheels and a white license on the front and back. The woman later claimed that the driver took her to a remote location and sexually assaulted her at knifepoint. The woman eventually managed to escape from the vehicle and ran to a residence nearby, where she reported what happened to the police.

The woman described the perpetrator as a Hispanic male in his forties. Still photos from the surveillance video were circulated over the media. By 2:15 p.m. that day, a citizen identified a vehicle matching that description located at 1016 Nottingham Road.

Police began surveillance on the location and observed the pickup as described above. At approximately 4:30 p.m., the surveillance team observed the Defendant and his wife leave the residence in a Cadillac Escalade. That vehicle was stopped by a patrol car and the Defendant was asked to return with the patrol officer to the Newark Police Headquarters to answer questions. He agreed and was taken

there by the patrol officer. The Escalade was towed to the station and his wife walked home.

After several hours at the police station, the Defendant gave a statement that he now seeks to suppress. The Court has considered the briefs of the parties, the video, audio and transcript of the Defendant's time at the station, a suppression hearing and the arguments of counsel. This is the Court's ruling on Defendant's motion.

## ANALYSIS

### A.    Defendant Invoked His Miranda Rights.

Defendant was taken to an interview room and met the detective investigating the early morning incident. The Defendant's first language is obviously not English, but he spoke and understood enough to communicate effectively.

The predominant feature of the first thirty minutes of the interview was the investigating detective's persistent efforts to get the Defendant to "tell his side of the story." Each time he raised this idea, the Defendant deflected or feigned misunderstanding. The detective, understanding that every answer that was not a "yes" was effectively a "no," reassured the Defendant that *Miranda* warnings were a mere formality, the Defendant was not under arrest and the detective merely wanted to hear his side of the story. For his part, the Defendant's responses followed

3

along the lines of ambivalence about whether he needed a Spanish-speaking interpreter, when he could leave and what he was in trouble for.

When the detective explained that he 1) was investigating an alleged sex crime, 2) was going to seek search warrants to collect evidence from the Defendant's body and 3) Defendant would have to remain there pending the warrants, he again asked the Defendant for his side of the story:

00:31:20     DB: So do you want to talk about . . . ?
           RR: Yeah, I mean, I don't have a problem.
           DB: Okay. So . . .
           RR: I didn't know I'm here. Now I understand why I'm here.

This response triggered the detective's full reading of the *Miranda* warnings, on paper. When he finished, it went like this:

           DB: With those rights in mind, do you want to talk about the allegation or what's led us to this point?
00:33:00     RR: So do I . . . sign here? No?

Whereupon, the detective made another effort to "clarify" Defendant's "no," and the following dialog occurred:

           DB: You know, if you tell us stuff and we can corroborate that, with everything that's going on in the mix there, you know, it can, it can help you out. But, you know, I have a job to do my job's to (UI) . . .
00:34:20     RR: Yes, yes.
           DB: . . . it's to contact people that are involved. So, yeah . . .
           RR: I understand that, but . . . I don't like it, so . . .
           DB: You don't want to talk?
           RR: Don't wanna talk.

At this point, the detective appears to accept Defendant's invocation of his "*Miranda* rights" and ceases continuing his efforts to get the Defendant to waive them and make a statement to the officer. Indeed, at oral argument on the motion, the State conceded that the Defendant made an invocation of his right to remain silent.

**B.    The Effect of Defendant's Invocation.**

The Defendant's invocation of the right to remain silent eliminates the need to review those cases dealing with "ambiguous invocations." Where a defendant's invocation under *Miranda* is ambiguous, Delaware follows the "clarifying approach," which permits law enforcement to continuing questioning the suspect, but only as to the ambiguity in the invocation of Miranda warnings.[1] Because the parties concede that the Defendant's invocation was not ambiguous, the law requires that the police "scrupulously honor" the invocation.[2] In *Rhode Island v. Innis*, the Supreme Court clarified the "scrupulous honor" that must be followed: not only is direct questioning prohibited, but also statements "that the police should know are reasonably likely to elicit an incriminating response from the suspect" are prohibited as well.[3]

---

[1] *Crawford v. State*, 580 A.2d 571, 575-76 (Del. 1990).
[2] *Michigan v. Mosley*, 423 U.S. 96, 104 (1975).
[3] *Rhode Island v. Innis*, 446 U.S. 291, 301-02 (1980).

This brings us to the next phase of the Defendant's encounter with the police as a result of the incident on May 4, 2019.

**C.** **The Search of Defendant's Body Was Not Reasonably Likely to Elicit an Incriminating Response.**

Upon Defendant's unequivocal invocation of his right to remain silent, he spoke to his wife, using the cell phone he still had when he came into the station. The video demonstrates the Defendant's clear understanding of his *Miranda* rights, as he explained them to his wife.

Over the next three and a half hours, the Defendant was left alone in the interview room. Clearly, no one contacted him directly seeking to have him compromise the right to remain silent he had invoked. Was the isolation a deliberate attempt to leave him feeling alone and without a resource to cope with the legal difficulty he found himself in?

That issue was raised by the Court in *Wainwright v. State*,[4] a case in which the defendant invoked his right to silence and was then told that his co-defendant had made statements incriminating him. Forty-five minutes later, after being isolated in a cell, Wainwright made incriminating statements. The State claimed the statements were spontaneous, to which the Court said, "[n]or does the fact that the defendant's statement was made after he was placed alone in a cell render it a purely

---

[4] 504 A.2d 1096 (Del. 1986).

6

spontaneous one. Indeed, the opportunity to mull over the effect of Dodson's accusatory statements could reasonably have had the opposite effect – to impress upon the defendant the seriousness of his predicament and the need to rebut his codefendant's accusations."[5]

The issue in *Wainwright* pivoted around the detective's "gratuitous" explanation of the evidence against him after Wainwright had invoked his right to silence. Thus, the Court's opinion about the effect of Wainwright's solitary cell experience was *dicta*. Here, there was no gratuitous, post-invocation "explanation" of the evidence against the accused. And no evidence was produced supporting the proposition that his delayed solitude was intentional. Rather, the testimony was that it was simply a byproduct of the problem of trying to obtain search warrants on his residence, truck and the body of the Defendant during the dinner hour. In the absence of contrary testimony, the Court accepts this as true.

Back in the interview room, evidence technicians finally arrived and served the Defendant with a search warrant for DNA, fingernail scrapings, pubic and scalp hairs, and a penile swab. All of this required him to disrobe completely. His clothes were seized. The only thing that approached a question designed to elicit a statement by the Defendant was the following exchange with the technician:

> DB: This is the signed search warrant. The judge approved us to remove those items.

---

[5] *Id.* at 1103.

RR: That means I am supposed to, they said rape, I raped somebody? That's…

DB: That's what it means.

RR: That's what, what it called?

DB: Yes. When you force somebody to perform a sexual act on you –

RR: [Interposing] Yes, yeah, I understand that.

DB: It's called rape. I'll just kind of take pictures throughout.

This was not news to the Defendant. Even before he invoked his *Miranda* rights initially, he was told there was an allegation of rape.[6] Further, the remaining time spent with the technicians and the Defendant was confined to collecting the samples called for in the search warrant. The Court finds the technician's interaction an insufficient basis upon which to conclude that the technician's statement was reasonably calculated to lead to an incriminating response from the accused.

As we pass this point of the interaction, it is worth noting that execution of a search warrant on the body and clothing of one accused of a sex offense is not a

---

[6] Before invoking his rights, the following exchange took place between the detective and the Defendant:

So like I said, the process is . . . because of the nature of what's being alleged. It's a . . . allegation of rape.

RR: Like an . . . allegation? Allegation?

DB: You've been accused of having sex with someone . . .

RR: Okay.

DB: Forcing someone to have sex with you . . .

RR: Okay.

DB: That's why you're here.

RR: Okay.

DB: That's why I'm having this conversation with you.

RR: Okay.

8

pleasant experience. The Defendant was told to strip naked and his clothes were seized. The police, lacking a change of clothing for him, gave Defendant a pair of blankets to cover himself, but not before plucking pubic hairs and taking penile swabs. It is invasive. On the other hand, there is no evidence that the execution of the search warrant was designed to provoke a waiver of Defendant's constitutional rights. There is no evidence that the search was anything but a routine evidence collection procedure in a case of this nature. So while the search warrant experience may well have had a psychological effect on the Defendant, it cannot be said that the experience itself was intended to provoke a statement by the accused.

Once the evidence technicians completed their tasks, the now blanketed Defendant was taken to a "soft" interview room. There he again used his cell phone and sat quietly for about 15 minutes alone. The door was open.

### D. Defendant Waived His Miranda Rights During the Next Phase of the Interview.

The detective testified that during this time he was finishing his paperwork and preparing to go home for the evening as he had been up on the investigation for many hours. The search of the Defendant's home was being completed, his wife was going to bring Defendant a change of clothes and, according to the detective's testimony, the Defendant was to be sent home. According to the detective, and the interview transcript, what happened next was entirely unexpected.

9

DB: Um, I think they're gonna be wrapping it up pretty soon and headin' back here. Uh, wife's gonna bring you clothing that you can get dressed into. Okay?

RR: Okay.

00:14:58 DB: So we're not – we're not gonna kick ya out on the street –

RR: Right.

DB: – like that, you know?

RR: Yeah.

DB: Um, so we're just gonna ask that you hang out here. Uh, Corporal Barnes (PH) is gonna hang out with you and once they get back here with that clothes, they're gonna get you outta here, okay?

RR: (UI) you're leaving? I'm sorry, sir.

00:15:18 DB: Uh, I probably – I gotta answer this phone call real quick. Hang on. (side phone conversation)

00:17:04 DB: Um, sorry. Uh – uh –

RR: That's fine.

DB: Yeah, I know you're having a long day. I've been up –

RR: I mean the – I know this is gonna change my life for the rest of my life, this situation right now, 'cause it's a – I got two kids (UI) and I don't want – what I told you

00:17:24 before, I don't wanna be something wrong with that, but just now I called my wife. She called me and she told the polices there and (UI), but I no – I no hurt nobody. That's what I try – when you told me before, I didn't wanna talk to you and I said no. Uh, I

00:17:44 know you're right. I can talk to you now and then I can tell you, uh, what is – what, uh – what happened last night, but now be too late and you don't wanna hear me, but you don't care and I tell you now 'cause I needed to get out. You know what I mean? I'm no

00:18:04 bad guy.

Defendant then spoke for approximately ten minutes concerning the events of the evening. It was incriminating. The detective did little to stop him, but little to encourage him either. Finally, the detective stopped the Defendant and retrieved a new form of *Miranda* waiver. He read it to the Defendant in detail, with the

10

Defendant verbally and in writing waiving his rights and giving a full statement to the police.

**E.    The Defendant's Spontaneous Statements Were Not in Response to Questioning or its Equivalent.**

The critical moment for our purposes was the moment when the detective entered the soft interview room and told the Defendant his clothes would be arriving soon and they were not "gonna kick you out on the street like that" and "once they get back here with that clothes, they're gonna get you outta here."  Were any of the statements by the detective "reasonably calculated to elicit an incriminating statement" by the Defendant?  The Court sees no point in the interaction that comes close.

Defendant asks the Court to consider *Tucker v. State*,[7] a case in which the Supreme Court reversed a finding that the defendant had spoken spontaneously to police during the booking process.  According to the Supreme Court, what actually happened was that the police continued to question the defendant about the offense after he had invoked.  The Court said the questions represented "a significant and unacceptable nexus between the continued questioning and defendant's statements."[8]

In order to find a "significant and unacceptable nexus" between the defendant's post invocation treatment and his subsequent statement, there must have

---

[7] *Tucker v. State*, 411 A.2d 603 (Del. 1980).
[8] *Id.* at 605.

11

been some triggering event by law enforcement after the invocation by defendant. In *Tucker*, the Court said "according to the Officer's own testimony, he continued to 'ask questions' of defendant about 'this offense.'"[9]  It was the provocation by the officer – not simply a change of heart by the accused – that impacted the exclusionary rule.

The Court is not insensitive to the delays in the interview room, the intrusive body search or the fact that the Defendant was without clothing and had to rely on blankets to cover himself.  The Court does not find, however, that any of these results were efforts by law enforcement to provoke the Defendant to give up his constitutional right to silence.  The video evidence makes it clear that the Defendant simply changed his mind about remaining silent and freely, knowingly and voluntarily elected to speak to the detective about what happened the previous evening.  His statement to the police, trying to minimize the event itself, his participation, exactly what happened – explanations that were fraught with internal and external inconsistencies – nonetheless support the proposition that his election to speak to the detectives appears to have been a rational (if mistaken) belief that he could convince the police that the victim had not spoken the truth about what happened and that the charges were at least an exaggeration.

---

[9] *Id.*

12

## CONCLUSION

The point here is not to separate truth from fiction or guilt from innocence. The motion to suppress is limited to whether the law enforcement conduct so overbore Defendant's will or so overstepped constitutional bounds as to render the subsequent statement inadmissible. The Court concludes that it did not and the motion to suppress must therefore be **DENIED.**

**IT IS SO ORDERED.**

Charles E. Butler, Resident Judge